## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH PIZZELANTI, Derivatively and on Behalf of SAGE THERAPEUTICS, INC., | Case No. |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| BARRY E. GREENE, KIMI IGUCHI, AL ROBICHAUD, JIM DOHERTY, STEPHEN J. KANES, LAURA GAULT, ELIZABETH BARRETT, MICHAEL F. COLA, JESSICA FEDERER, JAMES M. FRATES, GENO GERMANO, GEORGE GOLUMBESKI, JEFFREY M. JONAS, STEVEN PAUL, and KEVIN P. STARR, | |
| Defendants, | |
| and | |
| SAGE THERAPEUTICS, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

Joseph Pizzelanti ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Sage Therapeutics, Inc. ("Sage" or the "Company"), files this Shareholder Derivative Complaint against Barry E. Greene, Kimi Iguchi, Al Robichaud, Jim Doherty, Stephen J. Kanes, Laura Gault, Elizabeth Barrett, Michael F. Cola, Jessica Federer, James M. Frates, Geno Germano, George Golumbeski, Jeffrey M. Jonas, Steven Paul, and Kevin P. Starr (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Sage.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published and regarding Sage, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, public filings in the related federal securities class action lawsuit filed in the U.S. District Court for the Southern District of New York captioned *In re Sage Therapeutics, Inc. Securities Litigation, et al.*, 1:24-cv-06511-JAV (S.D.N.Y.) (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Sage against certain of its officers and directors seeking to remedy Defendants' violations of law that have occurred from April 12, 2021 to July 23, 2024 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Sage and its shareholders, including monetary losses and damages to Sage's reputation and goodwill.

2.      Sage is a biopharmaceutical company engaged in the development of therapies for neurological and psychiatric conditions, including 'major depressive disorder' ("MDD") and 'postpartum depression' ("PPD").

3.      Sage's core drug development efforts have focused on three primary product candidates: zuranolone, SAGE-718, and SAGE-324. Zuranolone was the company's lead asset, developed for the treatment of 'major depressive disorder' ("MDD") and 'postpartum depression'

("PPD"). SAGE-718 was developed to address cognitive disorders, including Parkinson's disease and Alzheimer's disease. SAGE-324 was intended for the treatment of essential tremor.

4.     During the Relevant Period, the Individual Defendants caused the Company to disseminate materially false and misleading statements concerning the efficacy, safety, durability, and commercial potential of zuranolone, SAGE-718, and SAGE-324. The Individual Defendants also failed to disclose material issues related to the clinical trial methodologies utilized by Sage and overstated the probability of obtaining approval from the United States Food and Drug Administration ("FDA") for the Company's drug candidates.

5.     On August 4, 2023, Sage announced that although the FDA had approved zuranolone for the treatment of 'postpartum depression' ("PPD"), it had declined to approve the drug for the treatment of 'major depressive disorder' ("MDD"), citing insufficient long-term efficacy and significant safety concerns.

6.     Following this disclosure, the price of Sage's common stock declined significantly. In conjunction with the announcement, Sage further disclosed that it would implement a "strategic reorganization," which entailed a reduction of approximately 40% of its workforce.

7.     Over the following year, Sage disclosed that its remaining two drug candidates, SAGE-718 and SAGE-324, were also experiencing substantial developmental setbacks.

8.     On April 17, 2024, the Company disclosed that data from its clinical study of SAGE-718 demonstrated no statistically significant difference in efficacy between the drug and a placebo over the period evaluated. Consequently, Sage announced that it would discontinue development of SAGE-718 for the treatment of Parkinson's disease.

9.     On July 24, 2024, the Company reported findings from its Phase 2 KINETIC 2 trial of SAGE-324, indicating that the drug did not demonstrate greater efficacy than a placebo over

the duration of the study. In response, Sage announced the termination of its open-label study of SAGE-324 for the treatment of essential tremor.

10.     As a direct and proximate result of the misconduct committed by the Individual Defendants, as alleged herein, the Company has sustained substantial financial harm. These losses include, but are not limited to, the costs associated with defending against the Securities Class Action, potential exposure to class-wide damages, significant reductions in market capitalization, reputational damage, and the erosion of goodwill.

11.     Due to the breaches of fiduciary duty by the Individual Defendants, most of whom are current directors of Sage, the collective engagement in fraud and misconduct, and the substantial likelihood of their liability in this derivative action and the Securities Action, a majority of Sage's Board of Directors cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and Section 27 of the Securities Exchange Act (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§78n(a) and Rule 14a-9 (17 C.F.R. §240.142-9) promulgated thereunder by the SEC.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

14.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this district pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391 because Defendants have conducted business in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District.

## PARTIES

*Plaintiff*

18.     Plaintiff is, and has been at all relevant times, a shareholder of Sage.

*Nominal Defendant*

19.     Nominal Defendant Sage is incorporated under the laws of Delaware, with its principal executive offices located at 55 Cambridge Parkway, Cambridge, Massachusetts. Sage common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "SAGE."

*Individual Defendants*

20.     Defendant Barry E. Greene ("Greene") has served as the Company's Chief Executive Officer ("CEO") since December 2020 and has been a member of the Board of Directors since October 2020. As disclosed in the Company's public filings, Greene received $58,864,150 in total compensation in 2021, $5,705,164 in 2022, and $6,237,491 in 2023. Greene is named as a

defendant in the Securities Class Action.

21.     The Company's 2024 Proxy Statement stated the following about Defendant

Greene:

> **Barry E. Greene**. Mr. Greene has served as our Chief Executive Officer and President since December 2020 and as a member of our Board of Directors since October 2020. Mr. Greene served as President of Alnylam Pharmaceuticals, Inc., or Alnylam, a public biopharmaceutical company, from 2007 through September 2020, and served as its Chief Operating Officer from 2003 to September 2016. Prior to Alnylam, he was General Manager of Oncology at Millennium Pharmaceuticals, Inc., a public biopharmaceutical company. Prior to joining Millennium in 2001, Mr. Greene served as Executive Vice President and Chief Business Officer for Mediconsult.com, a healthcare consulting company. Prior to joining Mediconsult.com, Mr. Greene's experience included serving as Vice President of Marketing and Customer Services for AstraZeneca (formerly AstraMerck), a pharmaceutical company; Vice President, Strategic Integration with responsibility for the AstraZeneca North American post-merger integration; and a partner of Andersen Consulting, a consulting company. Mr. Greene has served as a member of the board of directors of Karyopharm Therapeutics, Inc., since 2013, and previously served as a member of the boards of directors of Acorda Therapeutics, Inc., a public biotechnology company focused on nervous system disorders, from January 2007 to August 2021 and BCLS Acquisition Corporation, a former special purpose acquisition company, from October 2020 to October 2022. Mr. Greene received his B.S. in Industrial Engineering from the University of Pittsburgh and served as a Senior Scholar at Duke University's Fuqua School of Business. We believe Mr. Greene's qualifications to sit on our Board of Directors include his extensive experience and leadership in the healthcare and biopharmaceutical industries, including his experience serving as Chief Executive Officer at Sage.

22.     Defendant Elizabeth Barrett ("Barrett") has served as a member of the Company's

Board of Directors since January 2019 and currently serves on the Audit Committee. As disclosed

in the Company's public filings, Barrett received compensation in the amount of $540,860 in 2021,

$267,376 in 2022, and $425,050 in 2023.

23.     The Company's 2024 Proxy Statement stated the following about Defendant

Barrett:

> ***Elizabeth (Liz) Barrett.*** Ms. Barrett has served as a member of our
> Board of Directors since January 2019. Ms. Barrett has served as
> President and Chief Executive Officer and a board member of UroGen
> Pharma Ltd., a commercial-stage biopharmaceutical company since
> January 2019. She previously served as Chief Executive Officer of
> Novartis Oncology, or Novartis, from February to December 2018.
> Prior to Novartis, she was Global President, oncology at Pfizer Inc., or
> Pfizer, from 2015 to 2018. From 2009 to 2015, she held a series of
> leadership positions at Pfizer, including President, Europe, Global
> Innovative Pharma, President, North America, and President, U.S.
> Oncology business unit. Prior to Pfizer, from 2006 to 2009, Ms. Barrett
> was Vice President and General Manager of the Oncology business unit
> at Cephalon Inc. She also held senior roles across multiple market
> sectors at Johnson & Johnson from 1993 to 2006. In addition, Ms.
> Barrett has served as a member of the board of directors of Allogene
> Therapeutics, Inc., a public clinical stage immune-oncology company,
> since July 2021. Ms. Barrett received a B.S. from the University of
> Louisiana and an M.B.A. from Saint Joseph's University. We believe
> Ms. Barrett's qualifications to sit on our Board of Directors include her
> executive experience and years of leadership in the pharmaceutical
> industry.

24.    Defendant Michael F. Cola ("Cola") has served as a member of the Company's

Board of Directors since September 2014 and served on the Audit Committee throughout the

Relevant Period. As disclosed in the Company's public filings, Cola received compensation in the

amount of $552,527 in 2021, $274,857 in 2022, and $440,050 in 2023.

25.    The Company's 2024 Proxy Statement stated the following about Defendant Cola:

> ***Michael F. Cola.*** Mr. Cola has served as a member of our Board of
> Directors since September 2014. Mr. Cola has served as an advisor for
> Yale Ventures since October 2022 and an advisor for Mayo Ventures
> since June 2022. He served as Chief Executive Officer and a board
> member of Avalo Therapeutics, Inc. (formerly Cerecor, Inc.), or Avalo,
> a biopharmaceutical company, from February 2020 to February 2022.
> Prior to Avalo, Mr. Cola served as Chief Executive Officer of Aevi
> Genomic Medicine, Inc., or Aevi, a biopharmaceutical company
> formerly named Medgenics, Inc. from 2013 to February 2020. Prior to
> joining Aevi, from 2005 to 2012, he served as president of specialty
> pharmaceuticals at Shire plc, or Shire, a global specialty
> pharmaceutical company. Previously, from 2000 to 2005, Mr. Cola

served as a Growth Capital Provider and President of the life sciences group for Safeguard Scientifics, Inc., where he served as Chairman and Chief Executive Officer of Clarient, Inc., and Chairman of Laureate Pharma, Inc. In addition, Mr. Cola has held senior positions in product development and commercialization at Astra Merck Inc., where he led Phase 2 through Phase 4 clinical development efforts, and at AstraZeneca plc., where he led clinical development worldwide. He also currently serves on the board of directors of Phathom Pharmaceuticals, Inc., a late-stage biopharmaceutical company. Mr. Cola received a B.A. in biology and physics from Ursinus College and an M.S. in biomedical science from Drexel University. We believe Mr. Cola's qualifications to sit on our Board of Directors include his extensive experience working for various pharmaceutical and biotechnology companies.

26.     Defendant Federer ("Federer") has served as a member of the Company's Board of Directors since March 2023 and currently serves on the Audit Committee. As disclosed in the Company's public filings, Federer received $962,227 in compensation from the Company in 2023.

27.     The Company's 2024 Proxy Statement stated the following about Defendant Federer:

> *Jessica J. Federer.* Ms. Federer has served as a member of our Board of Directors since March 2023. Ms. Federer has served as a senior external advisor for McKinsey & Company since January 2024. She previously served as a Partner at Boston Millennia Partners, an investment fund focused on health technology companies, from May 2017 to September 2022. Ms. Federer also served as Chief Digital Officer at Bayer A.G. from October 2014 to January 2017, and in other leadership roles in regulatory affairs, market access, communications, and public affairs at Bayer A.G. beginning in 2008. She has served on the board of Aspivix SA, a private medical device company based in Switzerland, since December 2023, and as a board member of Pluto Health, a private health tech company, since September 2022. She has also served as an investment advisory board member of the Blavatnik Fund at Yale Ventures, since August 2023; a board member of Angelini Ventures, based out of Rome, Italy, since April 2022; and as a member of the Yale Institutional Review Board for oncology since December 2021. Ms. Federer served on the United Nations International Telecommunication Union (ITU) advisory board from July 2016 to July 2018. She began her public health career as an analyst at the Agency for Healthcare Research and Quality in the U.S. Department of Health and Human Services. Ms. Federer received a B.S. from the George Washington University and a M.P.H. from Yale University. We

believe Ms. Federer's qualifications to sit on our Board of Directors include her extensive experience and leadership in the life sciences industry and track record of using technology to help improve access and care.

28.     Defendant Frates ("Frates") has served as a member of the Company's Board of Directors since May 2014 and currently holds the position of Chairperson of the Audit Committee. As disclosed in the Company's public filings, Frates received compensation in the amount of $553,360 in 2021, $277,357 in 2022, and $435,050 in 2023.

29.     The Company's 2024 Statement stated the following about Defendant Frates:

> **James M. Frates.** Mr. Frates has served as a member of our Board of Directors since May 2014. Since January 2021, Mr. Frates has served as the Chief Financial Officer of Amylyx Pharmaceuticals, Inc., a pharmaceutical company focused on developing novel therapies for high unmet needs. Mr. Frates previously served as Senior Vice President and Chief Financial Officer of Alkermes plc from September 2011 until January 2021. From 2007 to 2011, Mr. Frates served as Senior Vice President and Chief Financial Officer of Alkermes, Inc. From 1998 to 2007, Mr. Frates served as Vice President, Chief Financial Officer and Treasurer of Alkermes, Inc. From 1992 to 1994 and 1996 to 1998, he was employed at Robertson, Stephens & Company, most recently as a Vice President in Investment Banking. Prior to that time, he was employed at Morgan Stanley & Co. Mr. Frates earned an A.B. in government from Harvard College and an M.B.A. from Harvard Business School. We believe Mr. Frates' qualifications to sit on our Board of Directors include his leadership experience, financial expertise, business judgment and industry knowledge.

30.     Defendant Germano ("Germano") has served as Chair of the Company's Board of Directors since January 2024 and has been a member of the Board since July 2016. As disclosed in the Company's public filings, Germano received compensation totaling $532,527 in 2021, $259,857 in 2022, and $417,550 in 2023.

31.     The Company's 2024 Proxy Statement stated the following about Defendant Germano:

> **Geno Germano.** Mr. Germano has served as the Chair of our Board of

Directors since January 2024 and as a member of our Board of Directors since July 2016. From August 2018 to June 2024, Mr. Germano served as President and Chief Executive Officer and a board member of Elucida Oncology, Inc., a biotechnology company. He previously served as President of Intrexon Corporation, or Intrexon, a leader in engineering and industrialization of biology, from June 2016 to March 2017. Prior to joining Intrexon, from 2014 to February 2016, Mr. Germano was Group President of the Global Innovative Pharma Business of Pfizer, where he led a growing global $14 billion business with market-leading medicines and an extensive portfolio of late-stage development candidates in several therapeutic areas. Mr. Germano was also Co-Chair of the Portfolio Strategy and Investment Committee at Pfizer from 2013 to February 2016. Previously, from 2009 through 2013, Mr. Germano served as President and General Manager of Pfizer's Specialty Care and Oncology business units where he led commercial, medical, and post proof-of-concept pipeline strategy and development across global markets. Additionally, Mr. Germano has served on the boards of directors of Precision Biosciences, Inc., a clinical stage biotechnology company, since March 2020 and Orbital Therapeutics, a private pre-clinical stage biotechnology company, since March 2025. In the past five years, Mr. Germano served on the boards of directors of Bioverativ Inc. (acquired by Sanofi S.A. in March 2018) and The Medicines Company (acquired by Novartis AG in January 2020). Mr. Germano received his B.S. in Pharmacy from Albany College of Pharmacy. We believe Mr. Germano's qualifications to serve on our Board of Directors include his over 30 years of experience in the pharmaceutical industry and his consistent track record of improving operating performance and increasing shareholder value, including across numerous leadership roles in multiple therapeutic categories and global markets at several pharmaceutical companies.

32.    Defendant Golumbeski ("Golumbeski") has served as a member of the Company's Board of Directors since January 2019. As disclosed in the Company's public filings, Golumbeski received compensation totaling $530,860 in 2021, $254,876 in 2022, and $412,550 in 2023.

33.    The Company's 2024 Proxy Statement stated the following about Defendant Golumbeski:

*George S. Golumbeski, Ph.D.* Dr. Golumbeski has served as a member of our Board of Directors since January 2019. Since October 2020, Dr. Golumbeski has served as a partner at DROIA Ventures, a venture capital firm focused on therapeutics for oncology and genetic disease,

and previously served as the President of GRAIL, Inc., a health-care company focused on the early detection of cancer, from August 2018 to September 2019. From 2009 to April 2018, Dr. Golumbeski was employed by Celgene Corporation, or Celgene, as Executive Vice President of Business Development. Prior to Celgene, Dr. Golumbeski was Vice President of Business Development, Licensing, and Strategy at Novartis. Earlier in his career, he held leadership positions at Elan Pharmaceuticals Inc. and Schwarz Pharma AG, where he focused on neurology and neuropsychiatry therapeutics. Dr. Golumbeski has served on the board of directors of Shattuck Labs, Inc., a public clinical-stage biotechnology company focused on cancer and autoimmune disease, since January 2018. He also previously served on the boards of directors of MorphoSys AG, a public commercial-stage biopharmaceutical company focused on cancer, from May 2018 until its acquisition by Novartis AG in May 2024 and Enanta Pharmaceuticals, Inc., a public clinical stage biotechnology company focused on viral infections, from February 2014 through March 2021. He serves on the boards of directors of various private companies. Dr. Golumbeski received a B.A. in Biology from the University of Virginia and a Ph.D. in Genetics from the University of Wisconsin—Madison. We believe Dr. Golumbeski's qualifications to sit on our Board of Directors include his years of experience in research and development, business development and leadership at various pharmaceutical companies.

### *Former Director Defendants*

34.    Defendant Jonas ("Jonas") served as a member of the Company's Board of Directors from August 2013 until December 2024. As disclosed in the Company's public filings, Jonas received compensation in the amount of $1,849,361 in 2022 and $496,542 in 2023.

35.    Defendant Paul ("Paul") served as a member of the Company's Board of Directors from September 2011 through June 2024. As disclosed in the Company's public filings, Paul received compensation totaling $531,693 in 2021, $254,876 in 2022, and $420,050 in 2023.

36.    Defendant Starr ("Starr") served as a member of the Company's Board of Directors from September 2011 until January 2024. According to the Company's public filings, Starr received compensation totaling $565,860 in 2021, $289,857 in 2022, and $420,050 in 2023.

11

*Former Officer Defendants*

37.     Defendant Iguchi ("Iguchi") served as the Company's Chief Financial Officer ("CFO") from March 2013 until October 2024. Iguchi is named as a defendant in the Securities Class Action. As disclosed in the Company's public filings, Iguchi received compensation totaling $2,423,918 in 2021, $1,624,967 in 2022, and $1,984,101 in 2023.

38.     Defendant Robichaud ("Robichaud") served as the Company's Chief Scientific Officer from November 2011 until August 2023. Following his tenure in that role, Robichaud continued to serve as a scientific consultant and as a member of Sage's Medicinal Chemistry and Clinical Scientific Advisory Boards. As disclosed in the Company's public filings, Robichaud received compensation totaling $2,796,162 in 2021, $1,588,053 in 2022, and $3,913,495 in 2023. Robichaud is named as a defendant in the Securities Class Action.

39.     Defendant Benecchi ("Benecchi") served as the Company's Chief Commercial Officer from September 2021 through October 2024. As disclosed in the Company's public filings, Benecchi received compensation totaling $2,732,430 in 2021, $1,865,704 in 2022, and $2,280,917 in 2023. Benecchi is named as a defendant in the Securities Class Action.

40.     Defendant Doherty ("Doherty") is a founding member of the Company and has held several key positions during his tenure, including serving as Senior Vice President of Research through 2017, Chief Research Officer through 2021, and Chief Development Officer until his departure in August 2023. Doherty is named as a defendant in the Securities Class Action.

41.     Defendant Kanes ("Kanes") served as the Company's Chief Medical Officer from July 2013 through November 2021. Kanes is named as a defendant in the Securities Class Action.

42.     Defendant Gault ("Gault") has served as the Company's Chief Medical Officer since November 2022. As disclosed in the Company's public filings, Gault received compensation

totaling $3,967,795 in 2022 and $1,274,325 in 2023. Gault is named as a defendant in the Securities Class Action.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

43.     By reason of their positions as officers, directors, and/or fiduciaries of Sage and because of their ability to control the business and corporate affairs of Sage, the Individual Defendants owed Sage and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

44.     The Individual Defendants were and are required to use their utmost ability to control and manage Sage in a fair, just, honest, and equitable manner.

45.     The Individual Defendants were and are required to act in furtherance of the best interests of Sage and its shareholders to benefit all shareholders equitably.

46.     Each director and officer of the Company owes Sage and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

47.     As fiduciaries of Sage, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

48.     The officers and directors of Sage were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

49.     Each Individual Defendant under their position as officers of Sage, owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

50.     As Sage's directors and officers, the Individual Defendants knowingly acted with

reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

51.     The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, *inter alia*, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company.

52.     As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

53.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

          a)     Ensure that the Company was operated in a diligent, hones, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to Sage's Code of Business Conduct and Ethics and internal guidelines;

          b)     Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

          c)     Remain informed as to how Sage conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable

inquiry in connection and in addition to that and to take steps to correct such conditions or practices;

d)    Establish and maintain systematic, accurate records and reports of the business and internal affairs of Sage and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

e)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Sage's operations would comply with all laws and Sage's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate.

f)    Exercise reasonable control and supervision over the Company's officers and employee's public statements and any other reports or information that the Company was required by law to disseminate.

g)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h)    Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54.    Each of the Individual Defendants also bore a duty of loyalty to Sage and its shareholders, mandating the prioritizations of the Company's and its shareholders' interests above their own in the management of the Company's affairs and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

55.    During the pertinent times, the Individual Defendants served as agents for each other and for Sage, always operating within the parameters of their agency.

56.    The Individual Defendants, through their advisory, executive, managerial, and directorial roles within Sage, were privy to detrimental, confidential information concerning the Company.

57.    Due to their positions of influence and authority, the Individual Defendants had the capability to, and indeed did, directly or indirectly control the improper actions detailed in this complaint, as well as the content of the various public declarations made by Sage.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.    In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

59.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of the law, including breaches of fiduciary duty and unjust enrichment.

60.    The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

61.    To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, each of the Individual Defendants, being directors of Sage,

was a direct, essential, and significant participant in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

62.     Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of their overall role in furthering the misconduct.

63.     At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of Sage, and at all times operated within the course and scope of that agency.

## SAGE THERAPUETICS CODE OF BUSINESS CONDUCT AND ETHICS

64.     The Individual Defendants, like all employees, directors and officers of the Company, are required to comply with Sage Therapeutics' Code of Business Conduct and Ethics (the "Code of Conduct"). The Code of Conduct starts with a message from Defendant Greene which states the following, in relevant part:

> **At Sage, we take pride in making medicines that matter so people can get better sooner and stay better longer. We embrace this mission with the understanding that it requires us to live Our Values in the way that we do business. Our Values Code is designed to help guide Sageans in fulfilling this commitment. It serves as the basis for our guidelines, policies and processes, reflecting that Our Values must be lived in a way that is respectful to each other, reflects our commitment to integrity in the work we do for our stakeholders, and complies with applicable laws, regulations, and industry standards.**
>
> **Sage's reputation, culture, and continued success depend on Our Values and a commitment to this Code being demonstrated at every level, from our Board of Directors to each individual employee. Each of us, as a custodian of Sage's good name, shares a personal responsibility to ensure that our conduct protects and promotes the highest meaning of Our Values, this Code, and every policy that flows from it.**

* * *

17

**It is the responsibility of every officer, employee, consultant, and other business partner of Sage and its subsidiaries (individually and collectively, "Sageans") to always act with honesty and integrity, and to know, understand, and live by Our Values, Our Values Code, the policies and trainings that flow from it, and all applicable laws and regulations (individually and collectively, "Our Standards").**

\* \* \*

### Quality and Patient Safety

Our commitment to Improve Lives prioritizes those who rely on products, information, services, education, and insights that we provide. Sage follows an established Quality System to ensure the safe and compliant development, production, and testing of our products. Sage is committed to meeting all regulatory requirements and promoting a culture of improving quality on a continual basis.

\* \* \*

### Production Promotion

The well-being of patients and their relationships with HCPs may be impacted by how we communicate about our products. We intend for our promotional discussions, information, and materials to be accurate and not misleading, and to comply with all applicable laws, regulations, and industry codes, including the PhRMA Code on Interactions with Healthcare Professionals and the European Federation of Pharmaceutical Industries and Associations ("EFPIA") HCP Code.

\* \* \*

We are committed to truthful, non-misleading, and fair balanced information about our products consistent with applicable regulations and guidelines. We do not overstate the efficacy of our products or minimize or misrepresent related risks or safety information.

\* \* \*

### Pricing and Payer Interactions

Sage seeks to sustain the support and confidence of all stakeholders in this process. We are committed to fulsome and transparent communication of relevant data consistent with applicable laws, regulations, and industry standards, to support HCP and payer decisions. We also strive to facilitate patient access to our therapies through appropriate support programs where permitted by applicable laws.

\* \* \*

A potential conflict of interest occurs when personal, financial, or other outside interests might interfere with Sage's interests or with decision-making on behalf of Sage. Even the appearance of a conflict of interest can damage reputations. Sageans must never place personal, social, financial, or political interests above the interests of Sage.

\* \* \*

## **Financial Reporting, Retention and Disclosure**

As a public company, the integrity, reliability and accuracy of Sage's books, records, and accounts are fundamental to our continued success and shareholder trust. We keep detailed and accurate books and records that fairly represent the disposition of our assets and operational results.

Sageans must never falsify any company record or create false or misleading documentation. This includes financial statements, time sheets, bills, invoices, expense reports, payroll records, benefits records, performance evaluations, and other forms and data used at Sage.

Sage's public reports and documents must include fair, accurate, timely and understandable disclosure in all material respects. Sageans who are responsible for these filings and disclosures, including Sage's principal executive, financial, and accounting officers, must use reasonable judgement and perform their responsibilities honestly, ethically, and objectively in this regard.

Similarly, Sageans who have responsibility for accounting and financial reporting matters must ensure that our accounting records and reports reflect all transactions, assets, liabilities, revenues, and expenses accurately, fairly, and in reasonable detail. They must also ensure that such records and reports comply with applicable laws and standards, including the Generally Accepted Accounting Principles ("GAAP"), and do not contain any materially false or intentionally misleading entries.

Sage maintains and stores company records in compliance with legal, regulatory, contractual, and financial obligations and we maintain operational efficiency by allowing for the disposition of records that are no longer required to be maintained and are no longer needed for an ongoing business purpose.

\* \* \*

## **Research and Development**

Sage drives experimentation and data-driven development by being fearless and bold in our approaches. We encourage Sageans to think differently because big problems need innovative solutions. These attributes inform our research and development programs. In conducting these programs, we hold Sageans to the

highest ethical, scientific, and clinical standards. We comply with all applicable laws, regulations, and industry standards related to our research and development activities, including the International Conference on Harmonisation, Guidelines for Good Clinical Practice ("ICH GCP"), Good Laboratory Practice ("ICH GLP"), and the Declaration of Helsinki. We keep the well-being and safety of research participants front and center in our efforts, and we are dedicated to the accurate and transparent reporting of results.

## SAGE THERAPEUTICS CORPORATE GOVERNANCE GUIDELINES

65.    The Company's Corporate Governance Guidelines outlines the role and responsibilities of the Board of Directors. It states, in relevant part:

> The Board of Directors (the "Board", and each member of the Board, a "Director") of Sage Therapeutics, Inc. (the "Company") has adopted the corporate governance guidelines set forth below to assist and guide the Board in the exercise of its responsibilities…

*  *  *

**DIRECTOR RESPONSIBILITIES**

- **Role of Directors**: The business and affairs of the Company are managed by or under the direction of the Board, acting on behalf of the stockholders. The Board has delegated to the officers of the Company the authority and responsibility for managing the Company's everyday affairs. The Board has an oversight role and is not expected to perform or duplicate the tasks of the Company's Chief Executive Officer or senior management.

*  *  *

## SAGE'S AUDIT COMMITTEE CHARTER

66.    Under the Audit Committee Charter in effect during relevant times, Defendants Frates (Chair), Cola, Barrett, and Federer ("Audit Committee Defendants") owed specific additional duties to Sage. Specifically, the Audit Committee Charter States:

**I.    General Statement of Purpose**

The purposes of the Audit Committee of the Board of Directors (the "Audit Committee") of Sage Therapeutics, Inc. (the "Company") are to:

- oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements;

- establish expectations for, oversee, and evaluate the effectiveness of a compliance and ethics program that advances a culture of integrity and upholds the Company's Code of Business Conduct and Ethics (as amended and/or restated from time to time, the "Values Code");

- take, or recommend that the Board of Directors of the Company (the "Board") take, appropriate action to oversee the qualifications, independence and performance of the Company's independent auditors; and

- prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

## II.    Composition

The Audit Committee shall consist of at least three (3) members of the Board, each of whom must (1) be "independent" as defined in Rule 5605(a)(2) under the Stock Market Rules of The Nasdaq Stock Market, LLC ("Nasdaq"); (2) meet the criteria for independence set forth in Rule 10A-3(b)(1) promulgated under Section 10A(m)(3) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), subject to the exemptions provided in Rule 10A-3(c) under the Exchange Act; and (3) not have participated in the preparation of the financial statements of the Company or a current subsidiary of the Company at any time during the past three years.

Notwithstanding the foregoing, one (1) director who (1) is not "independent" as defined in Rule 5605(a)(2) under the Stock Market Rules of Nasdaq; (2) satisfies the criteria for independence set forth in Section 10A(m)(3) of the Exchange Act and the rules thereunder; and (3) is not a current officer or employee or a Family Member of such officer or employee, may be appointed to the Audit Committee, if the Board, under exceptional and limited circumstances, determines that membership on the Audit Committee by the individual is required by the best interests of the Company and its stockholders, and the Board discloses, in the next annual proxy statement subsequent to such determination (or, if the Company does not file a proxy statement, in its Form 10-K), the nature of the relationship and the reasons for that determination. A member appointed under this exception may not serve on the Audit Committee for more than two years and may not chair the Audit Committee.

Each member of the Audit Committee must be able to read and understand fundamental financial statements, including a company's balance sheet, income statement, and cash flow statement. At least one member of the Audit Committee shall have past employment experience in finance or accounting, requisite professional certification in accounting, or any other comparable experience or background which

results in the individual's financial sophistication, including being or having been a chief executive officer, chief financial officer or other senior officer with financial oversight responsibilities. One or more members of the Audit Committee may qualify as an "audit committee financial expert" under the rules promulgated by the SEC.

The Nominating and Corporate Governance Committee shall recommend to the Board nominees for appointment to the Audit Committee annually and as vacancies or newly created positions occur. The members of the Audit Committee shall be appointed annually by the Board and may be replaced or removed by the Board with or without cause. Resignation or removal of a Director from the Board, for whatever reason, shall automatically and without any further action constitute resignation or removal, as applicable, from the Audit Committee. Any vacancy on the Audit Committee, occurring for whatever reason, may be filled only by the Board. The Board shall designate one member of the Audit Committee to be Chairperson of the Audit Committee.

## III.    Compensation

A member of the Audit Committee may not, other than in his or her capacity as a member of the Audit Committee, the Board or any other committee established by the Board, receive directly or indirectly any consulting, advisory or other compensatory fee from the Company. A member of the Audit Committee may receive additional directors' fees to compensate such member for the significant time and effort expended by such member to fulfill his or her duties as an Audit Committee member.

## IV.    Meetings

The Audit Committee shall meet as often as it determines is appropriate to carry out its responsibilities under this Charter, but not less frequently than quarterly, which meetings may be in person or by telephone conference or other communications equipment by means of which all persons participating in the meeting can hear each other. A majority of the members of the Audit Committee shall constitute a quorum for purposes of holding a meeting and the Audit Committee may act by a vote of a majority of the members present at such meeting. In lieu of a meeting, the Audit Committee may act by unanimous written consent.

## V.    Responsibilities and Authority

### A.    Review of Charter

- The Audit Committee shall review and reassess the adequacy of this Charter annually and recommend to the Board any amendments or modifications to the Charter that the Audit Committee deems appropriate.

**B.      Performance Evaluation of the Audit Committee**

- Periodically, the Audit Committee shall evaluate its own performance and report the results of such evaluation to the Board.

**C.      Matters Relating to Selection, Performance and Independence of Independent Auditors**

- The Audit Committee shall be directly responsible for the appointment, retention and termination, and for determining the compensation, of the Company's independent auditors engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. The Audit Committee may consult with management in fulfilling these duties, but may not delegate these responsibilities to management.

- The Audit Committee shall be directly responsible for oversight of the work of the independent auditors (including resolution of disagreements between management and the independent auditors regarding financial reporting) engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company.

- The Audit Committee shall instruct the independent auditors that the independent auditors shall report directly to the Audit Committee.

- The Audit Committee shall pre-approve all auditing services and the terms thereof (which may include providing comfort letters in connection with securities underwritings) and non-audit services (other than non-audit services prohibited under Section 10A(g) of the Exchange Act or the applicable rules of the SEC or the Public Company Accounting Oversight Board (the "PCAOB")) to be provided to the Company by the independent auditors; provided, however, the pre-approval requirement is waived with respect to the provision of non-audit services for the Company if the "de minimis" provisions of Section 10A(i)(1)(B) of the Exchange Act are satisfied. This authority to pre-approve non-audit services may be delegated to one or more members of the Audit Committee, who shall present all decisions to preapprove an activity to the full Audit Committee at its first meeting following such decision.

- The Audit Committee may review and approve the scope and staffing of the independent auditors' annual audit plan(s).

- The Audit Committee shall (1) request that the independent auditors provide the Audit Committee with the written disclosures and the letter

required by PCAOB Rule 3526 ("Rule 3526"), (2) require that the independent auditors submit to the Audit Committee at least annually a formal written statement describing all relationships between the independent auditors or any of its affiliates and the Company or persons in financial reporting oversight roles at the Company that might reasonably be thought to bear on the independence of the independent auditors, (3) discuss with the independent auditors the potential effects of any disclosed relationships or services on the objectivity and independence of the independent auditors, (4) require that the independent auditors provide to the Audit Committee written affirmation that the independent auditor is, as of the date of the affirmation, independent in compliance with PCAOB Rule 3520 and (5) based on such disclosures, statement, discussion and affirmation, take or recommend that the Board take appropriate action in response to the independent auditor's report to satisfy itself of the independent auditor's independence. In addition, before approving the initial engagement of any independent auditor, the Audit Committee shall receive, review and discuss with the audit firm all information required by, and otherwise take all actions necessary for compliance with the requirements of, Rule 3526. References to rules of the PCAOB shall be deemed to refer to such rules and to any substantially equivalent rules adopted to replace such rules, in each case as subsequently amended, modified or supplemented.

- The Audit Committee may consider whether the provision of the services covered in Items 9(e)(2) and 9(e)(3) of Regulation 14A of the Exchange Act (or any successor provision) is compatible with maintaining the independent auditor's independence.

- The Audit Committee shall evaluate the independent auditor's qualifications, performance and independence, and shall present its conclusions with respect to the independent auditors to the full Board. As part of such evaluation, at least annually, the Audit Committee shall:

  - obtain and review a report or reports from the independent auditors describing (1) the auditor's internal quality-control procedures, (2) any material issues raised by the most recent internal quality-control review or peer review of the auditors or by any inquiry or investigation by government or professional authorities, within the preceding five years, regarding one or more independent audits carried out by the auditors, and any steps taken to address any such issues, and (3) in order to assess the auditor's independence, all relationships between the independent auditors and the Company;

  - review and evaluate the performance of the independent

24

auditors and the lead partner (and the Audit Committee may review and evaluate the performance of other members of the independent auditor's audit staff); and

o   assure the regular rotation of the audit partners (including, without limitation, the lead and concurring partners) as required under the Exchange Act and Regulation S-X.

In this regard, the Audit Committee shall also (1) seek the opinion of management and the internal auditors, if any, of the independent auditor's performance and (2) consider whether, in order to assure continuing auditor independence, there should be regular rotation of the audit firm.

### D.    Audited Financial Statements and Annual Audit

- The Audit Committee shall review the overall audit plan (both internal and external) with the independent auditors and the members of management who are responsible for preparing the Company's financial statements, including the Company's principal accounting officer or principal financial officer.

- The Audit Committee shall review and discuss with management (including the Company's principal financial officer) and with the independent auditors the Company's annual audited financial statements, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

- The Audit Committee must review:

    (i)  any analyses prepared by management, the internal auditors, if any, and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles, or GAAP, methods on the financial statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the independent auditors. The Audit Committee may also consider other material written communications between the registered public accounting firm and management, such as any management letter or schedule of unadjusted differences;

    (ii) major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

(iii) major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

(iv) the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

- the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

- The Audit Committee shall review and discuss with the independent auditors any audit problems or difficulties and management's response thereto. This review shall include (1) any difficulties encountered by the independent auditors in the course of performing their audit work, including any restrictions on the scope of their activities or their access to information, (2) any significant disagreements with management and (3) a discussion of the responsibilities, budget and staffing of the Company's internal audit function.

  This review may also include:

  (i) any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise);

  (ii) any communications between the audit team and the audit firm's national office regarding auditing or accounting issues presented by the engagement; and

  (iii) any management or internal control letter issued, or proposed to be issued, by the independent auditors.

- The Audit Committee shall discuss with the independent auditors those matters brought to the attention of the Audit Committee by the independent auditors pursuant to Auditing Standard No. 1301, as amended and/or restated from time to time, or any successor standard ("AS 1301").

- The Audit Committee shall also review and discuss with the independent auditors the report required to be delivered by such auditors pursuant to Section 10A(k) of the Exchange Act. • If brought to the attention of the Audit Committee, the Audit Committee shall discuss with the Chief Executive Officer and principal financial officer of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the

Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting. • Based on the Audit Committee's review and discussions (1) with management of the audited financial statements, (2) with the independent auditors of the matters required to be discussed by AS 1301, and (3) with the independent auditors concerning the independent auditor's independence, the Audit Committee shall make a recommendation to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K for the last fiscal year.

- The Audit Committee shall prepare the Audit Committee report required by Item 407(d) of Regulation S-K of the Exchange Act (or any successor provision) to be included in the Company's annual proxy statement.

**E.     Unaudited Quarterly Financial Statements**

- The Audit Committee shall discuss with management and the independent auditors, prior to the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) such issues as may be brought to the Audit Committee's attention by the independent auditors pursuant to Auditing Standard No. 4105, as amended and/or restated from time to time, or any successor standard, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements.

**F.     Earnings Press Releases**

- The Audit Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

**G.     Risk Assessment and Management**

- The Audit Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management.

- In connection with the Audit Committee's discussion of the Company's risk assessment and management guidelines, the Audit Committee may discuss or consider the Company's major financial and cybersecurity risk exposures and

the steps that the Company's management has taken to monitor and control such exposures.

## H.    Compliance Program Oversight

- The Audit Committee shall be the final arbiter of interpretation and application of the Values Code. Any revision of the Values Code must be approved by the Audit Committee to become effective. The Audit Committee shall have sole responsibility to waive any provision(s) of the Values Code.

- The Audit Committee shall determine, on an annual basis, whether the Values Code has been communicated to all relevant employees of the Company and its subsidiaries and whether such employees have indicated that they have read and understand the Values Code and are not aware of any violations of it.

- The Audit Committee shall periodically review policies and procedures of the Company's compliance and ethics program and related plans for monitoring compliance with such policies and procedures.

- The Audit Committee shall review and discuss at least annually with the Company's Chief Compliance Officer the effectiveness of the Company's compliance and ethics program.

- The Audit Committee shall meet periodically with the Company's Chief Compliance Officer and the General Counsel to discuss and review compliance and legal matters that may have a material impact on the financial statements or the Company's policies and procedures and internal controls. The Audit Committee shall advise the entire Board of such discussions, as appropriate.

## I.    Procedures for Addressing Complaints and Concerns

- The Audit Committee shall establish procedures for (1) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and (2) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

- The Audit Committee may review and reassess the adequacy of these procedures periodically and adopt any changes to such procedures that the Audit Committee deems necessary or appropriate.

## J.    Regular Reports to the Board

- The Audit Committee shall regularly report to and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory

requirements, the performance and independence of the independent auditors, the performance of the internal audit function and any other matters that the Audit Committee deems appropriate or is requested to review for the benefit of the Board.

## VI. Additional Authority

The Audit Committee is authorized, on behalf of the Board, to do any of the following as it deems necessary or appropriate:

### A. Engagement of Advisors

- The Audit Committee may engage independent counsel and such other advisors it deems necessary or advisable to carry out its responsibilities and powers, and, if such counsel or other advisors are engaged, shall determine the compensation or fees payable to such counsel or other advisors.

### B. Legal and Regulatory Compliance

- The Audit Committee may discuss with management and the independent auditors, and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements. After these discussions, the Audit Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

- The Audit Committee may discuss with management legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its compliance policies and procedures.

### C. Conflicts of Interest and Oversight of Related Person Transactions

- The Audit Committee shall conduct an appropriate review of all related party transactions for potential conflict of interest situations on an ongoing basis, and the approval of the Audit Committee shall be required for all such transactions. The Audit Committee may establish such policies and procedures as it deems appropriate to facilitate such review.

### D. General

- The Audit Committee may form and delegate authority to subcommittees consisting of one or more of its members as the Audit Committee deems appropriate to carry out its responsibilities and exercise its powers. • The Audit Committee may perform such other oversight functions outside of its stated purpose as may be requested by the Board from time to time.

29

- In performing its oversight function, the Audit Committee shall be entitled to rely upon advice and information that it receives in its discussions and communications with management, the independent auditors and such experts, advisors and professionals as may be consulted with by the Audit Committee.

- The Audit Committee is authorized to request that any officer or employee of the Company, the Company's outside legal counsel, the Company's independent auditors or any other professional retained by the Company to render advice to the Company attend a meeting of the Audit Committee or meet with any members of or advisors to the Audit Committee.

- The Audit Committee is authorized to incur such ordinary administrative expenses as are necessary or appropriate in carrying out its duties.

Notwithstanding the responsibilities and powers of the Audit Committee set forth in this Charter, the Audit Committee does not have the responsibility of planning or conducting audits of the Company's financial statements or determining whether the Company's financial statements are complete, accurate and in accordance with GAAP. Such responsibilities are the duty of management and, to the extent of the independent auditor's audit responsibilities, the independent auditors. The Audit Committee shall have the authority to conduct or authorize investigations into any matters within the scope of its responsibilities as it shall deem appropriate, including the authority to request any officer, employee or advisor of the Company to meet with the Audit Committee or any advisors engaged by the Audit Committee.

## **FACTUAL BACKGROUND**

67.     Sage is a biopharmaceutical company engaged in the development of therapies for neurological and psychiatric disorders, including major depressive disorder and postpartum depression.

68.     In 2020, the global market for antidepressants was valued at approximately $14.93 billion, with projections estimating growth to $18.29 billion by 2027.

69.     Prior to and during the Relevant Period, Sage consistently highlighted the significant and expanding market for pharmaceutical treatments targeting depression.

70.     Prior to the Relevant Period, the Company's primary commercial product was Zulresso, a treatment for postpartum depression (PPD). Zulresso received FDA approval in March

2019 and was launched in the United States in June 2019. As of the beginning of the Relevant Period, Zulresso remained the only drug that Sage had successfully commercialized and brought to market.

71.     Traditionally, Zulresso has contributed only modest revenue to the Company's overall financial performance. For example, in 2023, Sage reported net revenue of just $10.5 million from Zulresso sales. In its Annual Report on Form 10-K filed with the SEC on February 14, 2024, Sage acknowledged challenges in generating revenue from the product, stating:

> Our current commercial operations for ZULRESSO are limited to account management focused on geographies that have existing, active ZULRESSO treatment sites. We expect that the commercial availability of ZURZUVAE for women with PPD, our limited commercial efforts for ZULRESSO, and barriers to treatment with ZULRESSO will continue to substantially limit the revenue opportunity for ZULRESSO and the number of healthcare settings that are or become treatment sites for ZULRESSO.

72.     Sage has funded its operations primarily through proceeds from sales of common stock and other securities-related transactions. Between 2010 and 2023, the Company received aggregate net proceeds totaling approximately $2.8 billion from such transactions but reported net losses in every fiscal year except 2020.

73.     During 2020, Sage reported net income of $606.1 million, attributable to revenue recognized under a collaboration and license agreement (the "Biogen Agreement") with Biogen, Inc. ("Biogen"). The Biogen Agreement involved a joint effort between the two companies to develop Sage's lead drug candidate, zuranolone (SAGE-217), as well as SAGE-324.

74.     Under the terms of the Biogen Agreement, Biogen agreed to pay an upfront sum of $875 million in exchange for an equal share of profits and losses from U.S. sales of zuranolone and SAGE-324, as well as the exclusive right to commercialize the two drugs in most international markets. Biogen also committed to making additional payments contingent upon the achievement

of specified commercial and regulatory milestones. Furthermore, Biogen agreed to purchase $650 million worth of Sage common stock, representing approximately 10.7% of the Company's total outstanding shares, by the end of 2020.

75.     On December 16, 2021, Sage submitted a shelf registration statement, which allowed the Company to offer and sell securities at its discretion without the cost or delay of filing separate registration statements for each issuance.

76.     Subsequently, on November 7, 2023, the Company entered into a sales agreement with Cowen and Company, LLC ("Cowen"), under which Sage was authorized to sell shares of its common stock through Cowen on a periodic basis.

77.     As outlined above, both prior to and during the Relevant Period, Sage relied extensively on securities offerings to finance its operations, including significant expenditures related to research and development. Consequently, the Company's ability to increase and sustain the market value of its common stock was essential to its ongoing business strategy.

78.     Before the onset of the Relevant Period, Sage was engaged in clinical trials aimed at evaluating the safety and efficacy of its drug candidates: zuranolone, SAGE-324, and SAGE-718.

79.     At the time, Sage was evaluating zuranolone through its LANDSCAPE and NEST clinical development programs. The LANDSCAPE program comprised five clinical studies focused on major depressive disorder (MDD): MDD-201B, MOUNTAIN, SHORELINE, WATERFALL, and CORAL. The NEST program consisted of two placebo-controlled studies targeting postpartum depression (PPD): ROBIN and SKYLARK.

80.     Regarding SAGE-324, Sage conducted the KINETIC study—a placebo-controlled Phase 2 clinical trial designed to assess the safety and efficacy of the drug for the treatment of

essential tremor in adult patients.

81.    Concerning SAGE-718, the Company was conducting the PARADIGM study for patients experiencing cognitive dysfunction associated with Parkinson's disease and the LUMINARY study for patients diagnosed with Alzheimer's disease. In addition, SAGE-718 was being evaluated in the DIMENSION study, a double-blind, placebo-controlled clinical trial designed to assess the drug's efficacy in treating Huntington's disease.

82.    Although the overall market for antidepressants is sizable, the market for treating postpartum depression (PPD) is comparatively limited, due in part to the significantly smaller population of eligible patients. One industry report estimated the PPD market to be approximately $800 million as of 2021. Moreover, commercializing treatments for PPD presents notable challenges.

83.    Accordingly, market analysts and industry commentators widely recognized that the most commercially significant opportunity for zuranolone was its use in treating major depressive disorder (MDD). For example, on November 27, 2020, Reuters reported that the driving force behind the Biogen Agreement was "to jointly develop and sell a treatment for major depressive disorder," omitting any reference to the drug's potential application for postpartum depression (PPD). In addition, Sage consistently conveyed that while zuranolone had potential utility for both MDD and PPD, its primary market opportunity resided in the treatment of MDD.

84.    Managing the treatment of major depressive disorder (MDD) presents challenges due to the inherently subjective nature of the condition. Clinicians rely on various subjective assessment tools to evaluate patients' symptoms and overall mental state, including the Hamilton Depression Rating Scale ("HAM-D") and the Montgomery-Åsberg Depression Rating Scale ("MADRS"). The HAM-D measures the severity of MDD based on a composite score reflecting

symptoms such as mood, insomnia, anxiety, weight loss, and suicidal ideation. While HAM-D evaluates fewer criteria than MADRS, it is faster to administer and particularly responsive to changes in symptom severity over time.

85.    Additionally, the treatment of major depressive disorder (MDD) is complicated by the long-term nature of the condition. MDD is recognized as a chronic illness, with recurrence rates estimated at 50% following a first episode, 70% after a second episode, and as high as 90% after a third.

86.    Accordingly, to obtain FDA approval for zuranolone as a treatment for major depressive disorder (MDD), Sage was required to demonstrate the drug's long-term efficacy.

87.    In June 2018, the Division of Psychiatry Products within the FDA's Center for Drug Evaluation and Research issued its most recent guidance for the development of pharmaceuticals intended to treat major depressive disorder (MDD), titled "Major Depressive Disorder: Developing Drugs for Treatment." This guidance underscores the necessity of demonstrating a treatment's long-term effectiveness, referred to as durability.

88.    The FDA has advised that "[e]fficacy generally should be demonstrated within 1 week for a rapid-acting antidepressant," while also stating that "[d]urability of [the] effect beyond the initial response should be characterized." In accordance with this guidance, the FDA further notes that "[t]o demonstrate both early onset of action and durability of effect, a primary efficacy endpoint early in the course of treatment would be chosen, with continued observation of drug-placebo differences over time."

89.    Moreover, the FDA's guidance emphasizes the significance of "maintenance treatment," noting that "[b]ecause depression usually is a cyclical disease, maintenance studies of conventional antidepressants are actually assessments of the ability of the drug to reduce the rate

of recurrence of depression. Conventional drugs for treatment of MDD are often taken long-term (defined as continuous or intermittent use for at least 6 months), given that MDD is a chronic condition requiring ongoing management to reduce the rate of recurrence."

90.    Additionally, the FDA's guidance highlights the importance of accounting for placebo response rates in clinical trials evaluating treatments for major depressive disorder (MDD). The guidance explains that "[h]igh placebo response rates and small magnitude of treatment effect (relative to placebo) are of concern in most conventional antidepressant trials, which makes defining the active control effect and choosing a noninferiority margin difficult."

91.    Consequently, pharmaceutical companies recognized that the FDA was unlikely to approve short-term treatments for major depressive disorder (MDD) absent evidence demonstrating sustained efficacy and durability of effect relative to placebo.

92.    Notably, Auvelity (also referred to as "AXS-05"), a drug developed by Axsome Therapeutics, Inc. ("Axsome"), received FDA approval for the treatment of major depressive disorder (MDD) in August 2022, having demonstrated both rapid onset and durable efficacy, along with minor side effects.

93.    As reflected in its public filings, Sage acknowledged that Auvelity represented a potential competitor to zuranolone. Given that Auvelity obtained FDA approval in August 2022 based on evidence of rapid and durable efficacy with minimal side effects, the Individual Defendants were, or should have been, aware that the FDA would be unlikely to approve any alternative treatment for major depressive disorder (MDD) absent comparable or superior durability and safety data.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

94.    On April 12, 2021, Sage published a press release (the "April 12, 2021 Press

35

Release"), which was filed with the SEC as part of a current report on Form 8-K, announcing the results of the Phase 2 KINETIC study evaluating SAGE-324 for the treatment of essential tremor.

95.    The KINETIC study evaluated the efficacy, safety, and tolerability of a 60 mg once-daily dose of SAGE-324 administered over a 28-day period to 69 patients diagnosed with essential tremor, followed by a two-week observation period. The protocol allowed for dose reduction to 45 mg or 30 mg in instances where the 60 mg dose was not well tolerated, a modification that was required in 62% of participants. Additionally, 38% of patients were discontinued from the study.

96.    An objective of the study was to evaluate the effect of SAGE-324 using the Essential Tremor Rating Assessment Scale ("TETRAS"), a clinical instrument designed to measure the impact of essential tremor on activities of daily living ("ADL").

97.    In its April 12, 2021 Press Release, Sage stated that the study achieved its primary endpoint and that SAGE-324 demonstrated superior performance compared to placebo:

> The study (n=67 full analysis set) achieved its primary endpoint of a statistically significant reduction from baseline compared to placebo in The Essential Tremor Rating Assessment Scale (TETRAS) Performance Subscale Item 4 upper limb tremor score on Day 29 (P=0.049), which corresponded to a 36% reduction from baseline in upper limb tremor amplitude in patients receiving SAGE-324 compared to a 21% reduction in patients receiving placebo. Activities of daily living (ADL) scores showed a statistically significant correlation with upper limb tremor score at all timepoints. While not powered to fully examine TETRAS ADL, SAGE-324 was numerically superior to placebo at all time points.

98.    Additionally, the April 12, 2021 Press Release reported that SAGE-324 exhibited efficacy in reducing more severe tremor symptoms:

> In the KINETIC Study, patients (n=47) with a more severe tremor at baseline (at or above the median TETRAS Performance Subscale upper limb tremor Item 4 score of 12) who received SAGE-324, demonstrated a statistically significant reduction (P=0.007) from baseline in TETRAS Performance Subscale Item 4 upper limb tremor score compared to placebo at Day 29, corresponding to a 41% reduction from baseline in upper limb tremor amplitude in patients receiving SAGE-324 compared to an 18% reduction for placebo. Study patients were not taking other medications for ET during the 28-day treatment period.

99.    Further, the April 12, 2021 Press Release included a statement from Defendant Greene, who was quoted as follows:

> In the design of the KINETIC Study, we set a high bar and believe we exceeded it. SAGE-324 met the primary endpoint in the trial and demonstrated a safety profile generally consistent with previously reported data. The strong correlation observed in this study between TETRAS performance scale—measuring reduction of upper limb tremor, a disabling symptom experienced by more than 90% of people suffering from essential tremor—and improvement on the ADL score provides suggestive evidence that these findings have the potential to be truly impactful for people with essential tremor.

100.    Later that same day, the Company conducted a call with analysts to review the results of the Phase 2 KINETIC study of SAGE-324 (the "April 12, 2021 Analyst Call"). During his opening remarks, Defendant Greene emphasized the asserted efficacy of SAGE-324, stating that "as we've been saying for some time, we were looking for a big effect, in the range of 30% to 50% sustained reduction in tremor amplitude from baseline." He further noted that Sage was "looking for the high end of the dose range [to] have the meaningful effect... This was the high bar, and we believe we exceeded it." Defendant Greene also stated:

> First of all, the study achieved its primary endpoint with SAGE-324 demonstrating a statistically significant reduction from baseline in the TETRAS Item 4 upper limb tremor score at day 29 in the total study population compared to placebo or the ITT analysis, which corresponds to a 36% reduction from baseline in upper limb tremor amplitude in patients receiving SAGE-324 versus the 21% reduction in patients receiving placebo. And the safety profile was generally consistent with previously reported data from SAGE-324.
>
>        Other highlights from the study to point out. Patients with a more severe tremor baseline, those representing the moderate-to-severe patient population, demonstrated a statistically significant reduction from baseline in the TETRAS Item 4 upper limb tremor score at day 28, which corresponded to a 41% reduction in upper limb tremor amplitude compared to an 18% reduction for placebo. We believe patients with more severe tumor, that is TETRAS score of greater than 12, represent the majority of ET patients getting diagnosed and seeking treatment today.

101.    Although Defendant Greene acknowledged that the study did not fully assess the

impact of essential tremor on activities of daily living, he nonetheless conveyed that the Company

maintained an optimistic outlook regarding the continued development of SAGE-324:

> Importantly, the activities of daily living, or ADL scores, showed a statistically significant correlation with upper limb tremor scores at all time points. Now while not powered to fully examine TETRAS ADL, SAGE-324 was numerically superior to placebo at all time points during the study, demonstrating the clinically meaningful nature of these data and the importance to ET patients.
>
> So hitting statistical significance in the primary endpoint, achieving clinically meaningful reductions in tremor amplitude, seeing the ADL tremor correlation all with an AE profile that was in line with our expectations for the 60-milligram dose is [an] encouraging and exciting outcome for this Phase II trial. These data reinforce our belief that the pharmacologic characteristics of SAGE-324 are well suited for development opportunities in essential tremor and possibly other indications. With these new data, we'll work with our collaboration partners at Biogen to optimize next steps for the continued development of SAGE-324 in essential tremor.

102.    Similarly, Defendant Kanes reaffirmed that the study produced favorable outcomes,

expressing that he was "highly encouraged" by the findings. He stated that SAGE-324 "met its

primary endpoint, a significant reduction in TETRAS Item 4 upper limb tremor score from baseline

at day 29," reflecting a 36% reduction from baseline, compared to a 21% reduction observed in

the placebo group. Defendant Kanes further noted that, among patients with more severe tremor,

the study demonstrated a 41% reduction from baseline at Day 29, as compared to 18% for the

placebo. He also emphasized that "activities of daily living scores showed a statistically significant

correlation with upper limb tremor scores at all time points," concluding that "[f]rom a clinical

point of view," the outcome was "an important consideration."

103.    Moreover, Defendant Kanes asserted that "now we know that we have a drug which

shows the effect, the effect didn't wear out. It didn't wear off or tachyphylaxis over the course. . . .

Suffice it to say that these are truly clinically meaningful results."

104.    In addressing a question concerning "how the [FDA] might be weighing the

significance of improvements on functional endpoints versus straight tremor reductions,"

Defendant Greene responded that "at every time point, activities of daily living were superior for drug versus placebo [and that] gives us tremendous flexibility as we negotiate with the agency." He reinforced this position by stating that the "statistically significant correlation . . . again, gives us tremendous optionality as we work with regulators on what's the most important and on what's most important to patients."

105.    Additionally, Defendant Doherty confirmed the Company's optimistic stance regarding the trial results, stating that "it's really very, very interesting and very encouraging that we're seeing a good correlation across response to the primary endpoint, the TETRAS scale as well as response to the ADL." He further noted that "the placebo response is more or less in line with what we are hearing from KOLs [key opinion leaders] and others working in the space."

106.    Concluding the April 12, 2021 Earnings Call, Defendant Kanes reiterated that the study supported the efficacy of SAGE-324:

> For us, this is, first and foremost, a scientific confirmation that dosing over the course of a month with this mechanism has true differences. Those differences are maintained over time that the mechanism that we've seen repeatedly with multiple drugs, related drugs in this class does holds up into the most, I would say, rigorous scrutiny in a randomized, placebo-controlled trial. And that gives us great confidence to move forward.

107.    The statements made by the Individual Defendants on April 12, 2021 were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants caused the Company to withhold from investors the following material information: (i) the FDA had expressed general reluctance to rely on the TETRAS scale as a primary endpoint for evaluating the efficacy of drug candidates intended for the treatment of essential tremor; (ii) accordingly, emphasizing the TETRAS scale as a primary efficacy endpoint and highlighting the purportedly positive results from the SAGE-324 study was misleading; (iii) the Individual Defendants

materially overstated the results of the study, including by asserting that SAGE-324 dosing "maintained over time that the mechanism that we've seen repeatedly with multiple drugs, related drugs in this class does holds up into the most . . . rigorous scrutiny."

108.    Subsequently, on April 29, 2021, Sage filed a proxy statement on Form DEF 14A with the SEC (the "2021 Proxy Statement"), seeking shareholder approval for, among other matters: (i) the re-election of Defendants Barrett, Germano, and Paul to serve an additional three-year term on the Company's Board of Directors; and (ii) the compensation of certain executive officers of the Company, including Defendants Greene, Jonas, Iguchi, and Robichaud.

109.    The 2021 Proxy Statement included representations concerning the Company's internal controls and legal and regulatory compliance, stating that "the Audit Committee operates under a written charter approved by the Board of Directors, which provides that its responsibilities include the oversight of the quality of our financial reports and other financial information and our compliance with legal and regulatory requirements" and "reviewing with management and our independent registered public accounting firm the adequacy of our internal controls over financial reporting."

110.    Concerning the Company's risk assessment and risk management practices, the 2021 Proxy Statement stated:

> Our Board of Directors oversees the management of risks inherent in the operation of our business and the implementation of our business strategies. Our Board of Directors performs this oversight role by using several different levels of review. In connection with its reviews of the operations and corporate functions of our company, our Board of Directors addresses the primary risks associated with those operations and corporate functions. In addition, our Board of Directors reviews the risks associated with our company's business strategies periodically throughout the year as part of its consideration of undertaking any such business strategies.
> Each of the committees of our Board of Directors also oversees the management of our risk that falls within the committee's areas of responsibility. In performing this function, each committee has full access to management, as well as the ability to engage advisors. Our Chief Financial Officer provides reports to the Audit

Committee, and is responsible for identifying, evaluating and implementing financial risk management controls and methodologies to address any identified risks. In connection with its risk management role, our Audit Committee meets privately with representatives from our independent registered public accounting firm, and privately with our Chief Financial Officer. The Audit Committee evaluates from time to time the processes by which our exposure to risk is assessed and managed by management.

111.    The 2021 Proxy Statement emphasized zuranolone's purported durability, stating that "approximately 70% of patients successfully treated with zuranolone 30 mg in the first treatment cycle needed two or fewer treatment courses over one year."

112.    Regarding the KINETIC study of SAGE-324, the 2021 Proxy Statement reported that the study "had achieved its primary endpoint."

113.    On May 4, 2021, Sage filed its quarterly report on Form 10-Q with the SEC for the first quarter of 2021 (the "1Q21 10-Q"), issued a press release filed on a current report on Form 8-K with the SEC (the "1Q21 Press Release"), and conducted a related earnings call (the "1Q21 Earnings Call").

114.    The 1Q21 Press Release emphasized the purportedly favorable outcomes from clinical trials involving zuranolone, SAGE-324, and SAGE-718. It also included a statement from Defendant Greene, who asserted that "the progress we've made so far this year sets us up for near-, medium- and long-term value creation opportunities as we further advance our deep organic pipeline."

115.    Concerning the SHORELINE study, designed to evaluate zuranolone's "safety and tolerability . . . in adults for up to one year", the 1Q21 Press Release stated that "[a]fter the initial 2-week zuranolone treatment, more than 70% of patients who received 30 mg and 80% of patients who received 50 mg achieved positive response at Day 15." The release further noted that 70% of patients who received the 30 mg dose "required at most one additional zuranolone treatment during

the 12-month study," including 210 of 489 patients (42.9%) who "used only the single initial zuranolone course" and 125 patients (25.6%) who "used a total of two courses." Additionally, among the 199 patients who received the 50 mg dose, "43.2% achieved remission after the initial 2-week treatment period."

116.    Regarding the KINETIC study, which was conducted to evaluate the "efficacy, safety, and tolerability of SAGE-324 60 mg in patients" with essential tremor between the ages of 18 and 80, the 1Q21 Press Release disclosed that "the daily dose could be down-titrated to 45 mg or 30 mg if 60 mg was not well tolerated," a modification that "occurred in 62% of patients," and that treatment was discontinued for 38% of participants. The Press Release additionally stated that "ADL scores showed a statistically significant correlation with upper limb tremor score" and that SAGE-324 was "numerically superior" to placebo across all time points evaluated in the study.

117.    Pertaining to the Phase 2a open-label PARADIGM study, which was designed to assess the efficacy of SAGE-718 in eight patients aged 50 to 75 years with mild cognitive impairment associated with Parkinson's Disease who received a 3 mg daily dose over a two-week period, the 1Q21 Press Release stated that "[p]atients showed performance improvements from baseline on multiple tests in the cognitive domain of executive function during the 14 days of treatment" and that "[e]merging signals on several measures also suggested improved performance from baseline on additional cognitive tests in the domains of learning and memory."

118.    Additionally, the 1Q21 Press Release noted that "[i]n April 2021, Axsome Therapeutics, Inc. announced that the FDA had accepted and granted priority review to the NDA package for its NMDA receptor antagonist, AXS-05, which received Breakthrough Therapy designation for MDD in March 2019."

119.    During the 1Q21 Earnings Call, Defendant Greene stated that, with respect to zuranolone, "[t]he 30-milligram showed that approximately 70% of participants had a positive response to an initial 2-week treatment and required at most 1 additional zuranolone treatment during the 12-month study period," and further reported that "more than 70% of patients who received 30 milligrams and 80% of patients who received 50 milligrams achieved positive response at day 15."

120.    Regarding SAGE-324, Defendant Greene stated that Sage aimed to achieve "a reduction in tremor amplitude of 30% to 50% that was sustained for the full study period" in the KINETIC study, clarifying that this meant "[i]n other words, no loss of effect or tachyphylaxis." Defendant Greene further asserted that the drug "achieved our objectives and more."

121.    Concerning SAGE-718, Defendant Greene stated that "the interim data cut" from the PARADIGM study "showed patients demonstrated improved performance from baseline on multiple tests of executive function over 14 days of treatment."

122.    During the 1Q21 Earnings Call, Defendant Kanes highlighted what he described as "great progress across all 3 franchises to date." With respect to zuranolone, he reported that "[i]n the 30-milligram cohort at day 15, the mean change from baseline was 15.2 points and 73.5% of patients achieved response. And 40% achieved remission as measured by a HAM-D score of less than or equal to 7. In the 50-milligram cohort at day 15 of the initial treatment course, the mean HAM-D change from baseline was 16. 80.5% of patients achieved response and 43.2% achieved remission."

123.    Subsequently, during the 1Q21 Earnings Call, an analyst asked whether "there [is] a threshold, a written threshold in the public domain by [the] FDA on what might complicate actual approval either on sedation or somnolence." In response, Defendant Greene emphasized the

efficacy of zuranolone in treating major depressive disorder (MDD) relative to existing approved therapies. He stated that "to date, the profile we've seen is extraordinarily consistent," citing a "rapid onset of action in 3 to 4 days, patients report they're feeling better," and "remarkable efficacy [in] 2 weeks, both 30 and 50 [mg], with most patients requiring only 1 or 2, 2-week doses in the entire year." Defendant Greene further asserted, "to be clear, if we hit the primary endpoint, given the different benefit risk of zuranolone, over 35 years' worth of antidepressants, we have a very important medicine in the [Company's] LANDSCAPE [drug development program]."

124.    Additionally, Defendant Kanes explained that "somnolence is something that is often desirable for patients with depression," attributing this characteristic to the "very low dropout rate from our clinical trials." He also reinforced Defendant Greene's remarks, stating that, with respect to zuranolone, "the numbers that we're reporting are actually comparable, if not better, than many drugs that are used right now to treat depression." Defendant Kanes further asserted that "reports that we have for either somnolence, sedation and so forth, are well within the parameters of drugs that are approved for the treatment of depression, even standard antidepressants."

125.    During the 1Q21 Earnings Call, an analyst requested "information available at the top line" from the WATERFALL study of zuranolone and asked "how important . . . based on your doctor feedback" is "longer durability of response for these acute treatment regimes?" In response, Defendant Greene claimed that "[t]here's nothing out there that gets patients better, faster and keeps them better," while also noting that "we're looking at all the secondary endpoints." He further stated, "[f]or day 42, what we're looking for is consistency of effect in the drug arm, not necessarily versus placebo."

126.    Then, an analyst observed that "a practice mentioned they couldn't claim MDD

44

treatment if they only treat patients for 15 days" and that "[s]o they also look at the day 28 data for

their MDD drug candidate." The analyst proceeded to ask: (i) "how important is that [secondary

endpoint] day 42 data for [the] zuranolone filing"; and (ii) "how did [the] FDA view the open-

label SHORELINE study and supporting evidence for the durability of zuranolone?" In response,

Defendants Greene and Kanes reiterated that zuranolone met its primary efficacy endpoint at Day

15 and emphasized the drug's "unique" profile.

127.    Regarding zuranolone's likelihood of obtaining FDA approval, an analyst posed

the following question: "If WATERFALL and CORAL were to fail, but the Phase III postpartum

study were to succeed, would you launch this drug in PPD, and then kind of figure everything else

out later, or would you wait?" In response, Defendant Greene stated:

> [W]e are highly encouraged by the upcoming data readouts. We sat down with the
> agency and mapped out 3 unique approaches, 3 unique different ways to potentially
> get approval to an MDD, as you've highlighted, and 1 in PPD. And we believe that
> 1 of those Phase III needs to be positive for us to have a drug on the market.
>
> So we're very enthusiastic about all 3 approaches and believe that as you see with
> many drugs, we need 1 positive Phase III here. And that's an agreement with the
> agency. Yes, we scenario plan with Biogen at a very high level, but not in any detail.

128.    The statements made above were materially false and/or misleading, as they

omitted to disclose material adverse facts concerning the Company's business, operations, and

future prospects. In particular, the Individual Defendants caused the Company to withhold from

investors the following material information: (i) the risk associated with the Company's ability to

obtain FDA approval for zuranolone was materially understated; (ii) the likelihood that the FDA

would approve both Auvelity and zuranolone in close succession was low, particularly in light of

Auvelity's superior clinical trial outcomes; (iii) the effect that FDA approval of Auvelity would

have on zuranolone's potential market share and overall commercial viability was materially

understated; (iv) the efficacy of zuranolone in treating MDD was materially overstated, and it was

misleading to claim that "the numbers [Sage is] reporting are actually comparable, if not better, than many drugs that are used right now to treat depression"; (v) the demonstrated durability of zuranolone was materially overstated; (vi) the efficacy and durability of SAGE-324 were materially overstated; (vii) the adverse safety risks associated with the use of zuranolone were significantly understated.

129.    On June 15, 2021, Sage released a press statement, filed as part of a current report on Form 8-K with the SEC, disclosing results from the WATERFALL study evaluating the efficacy and safety of zuranolone in adults with major depressive disorder (MDD) (the "June 15, 2021 Press Release").

130.    The June 15, 2021 Press Release stated that the study enrolled 543 patients with major depressive disorder (MDD), achieved its primary endpoint, and "show[ed] statistically significant improvement in depressive symptoms compared with placebo at Day 15 as assessed by the 17-item Hamilton Rating Scale for Depression (HAMD-17) total score." The release further represented that "[p]atients with a response at Day 15 in the zuranolone group retained on average 86.1% of their HAMD-17 improvement at Day 42 (4 weeks after dosing ended)," and noted that "[w]hile not statistically significant, a numerical advantage in favor of zuranolone was demonstrated at Day 42."

131.    That same day, Sage conducted an analyst conference call to discuss the results of the WATERFALL study (the "June 15, 2021 Analyst Call"). During his opening remarks, Defendant Greene stated that zuranolone met its primary endpoint by "demonstrating a statistically significant reduction in HAM-D scores at day 15 at the end of the 14-day dosing period." He further reported that "patients who responded to zuranolone at day 15 retained more than 85% of their improvement out to the last time point in the study, day 42."

132.    Defendant Greene highlighted zuranolone's purported durability in the treatment of MDD, stating that there was "rapid onset of activity . . . after the second dose, as measured by day 3," and that "more than 70% [of] patients receiving a 30-milligram dose of zuranolone needed only 1 or 2, 2-week treatments over the course of a year to maintain wellness."

133.    Defendant Greene asserted that interactions with the FDA reflected positively on zuranolone's regulatory prospects, stating that "we sat down with the agency and mapped out 3 distinct Phase IIIs, any of which, if positive, was a fileable event. We believe that that's what we have here with WATERFALL."

134.    Additionally, during the June 15, 2021 Analyst Call, Defendant Kanes emphasized zuranolone's purported advantages over existing treatments in terms of durability for MDD, stating that "current treatment options require chronic dosing, may take up to 4 to 6 weeks to show an effect, if any, and often cause troubling side effects."

135.    An analyst posed the following question:

I wanted to talk about regulatory, I guess, and I hope you don't mind if it's [a] two-part question. I guess for one, how would you characterize your confidence level that this is truly a positive study from a regulatory perspective, and that a lack of delta, small waning of effect of the drug at day 42 doesn't matter regulatory-wise? And then the second thing on regulatory, maybe you could just comment on what your base case is for how much safety data you'll need in terms of retreatment and long-term follow-up, and whether or not you have that right now or you're likely to need materially.

136.    In reply, Defendant Greene reiterated that "we set out at the beginning of the year guiding that after meeting with the FDA, we designed 3 unique Phase IIIs that presented 3 unique opportunities for positive readouts, any of which, if hit, were a fileable outcome."

137.    Later in the call, Defendant Greene again emphasized the notion that the Company could obtain FDA approval based solely on the results of the WATERFALL study, even in the event that the ongoing CORAL study produced negative outcomes:

[W]e have 3 unique Phase IIIs. Any one of which, if positive, is fileable. So positive CORAL would be great, but it's not needed for approval. We believe that what we see in WATERFALL is what we need for a drug to be approved.

138.    Furthermore, Defendant Kanes underscored the drug's purported durability, referring to it as "maintenance of efficacy," and stated:

[W]ith regard to regulatory, the way that we're thinking about maintenance of efficacy, we've had this question before with ZULRESSO, what's important here is stability. And we certainly have demonstrated that across the entire program with more than 85% of patients maintaining benefit. So overall, we're looking forward to having those discussions with the FDA. But this is clearly fileable, and as Barry said, we're looking to think about the most efficient way to do that.

139.    During the call, an analyst inquired about the factors physicians would consider when "decid[ing] whether to prescribe the drug," specifically asking whether they would "merely look at the delta versus placebo at day 15 and day 42[.]" In response, Defendant Greene stated that "physicians will reach for zuranolone either alone or concomitant with another antidepressant, which doesn't necessarily help get them out of the depressive symptoms but can help them, once better, stay well as we've seen with zuranolone."

140.    Subsequently, Defendant Kanes echoed Defendant Greene's remarks, stating:

[W]hat's unique about this and absolutely different from everything that's out there is the ability to treat patients quickly, a 2-week course of therapy, and then know that if they need additional retreatment as we've seen in SHORELINE, they'll have reliable response again. That's something very, very different.

141.    Later in the June 15, 2021 Analyst Call, Defendant Greene emphasized the clinical significance of the WATERFALL study results, stating that "the reduction in HAM-D scores in the WATERFALL are clinically meaningful. . . . And just to emphasize, what's important here again is that patients got better rapidly and stayed better longer with maintenance of effect out to day 42, and that's what matters most to patients."

142.    Additionally, Defendant Kanes stated that "[t]he consistency that we've seen in terms of the overall benefit for patients on zuranolone has been rock solid since our first study." With regard to the delta from placebo, Defendant Kanes further stated:

> And so the delta from placebo, that's driven entirely by the variability that we see in placebo. And that's a constant challenge within depression trials. It's one of the reasons why we emphasize what it is that the drug does as opposed to trying to war game out what that delta from placebo is.

> So at the end of the day, as we said, the large drops in terms of symptoms as well as the maintenance of efficacy is what really matters to patients. And from a physician and from patient perspective, those are the things that are absolutely critical for when they would choose to use this and for which patients.

143.    Moreover, Defendant Doherty concurred that "placebo response does vary," and observed that zuranolone exhibited a "rapid response as early as day 3" that "maintained out through time," whereas "the placebo response" emerged "through day 15."

144.    Subsequently, during the June 15, 2021 Analyst Call, Defendant Kanes responded to an inquiry concerning the "maintained response rate for placebo," but notably did not address whether the strength or duration of the placebo response called into question the significance of zuranolone's trial results:

> So the placebo was maintained. I mean we see placebo across all of our trials. And that's why our—obviously, we didn't separate from placebo at day 42. A little less relevant because if you look in the real world, the placebo responses aren't what and what no treatment really refers to. And that's one of the challenges in this field, but really, the important part here is day 15 in the primary endpoint.

145.    Thereafter, Defendant Doherty addressed "the secondary endpoints, relapse and remission rates," stating that "response and remission rates are really consistent with the pooled response and remission rates across the placebo-controlled Landscape and Nest studies, including both MDD and PPD." He further emphasized that "[t]he key point is that patients are getting better fast, and they're maintaining that improvement out through the study."

146.    In response to a question concerning durability, Defendant Kanes stated that "about 70% of patients require no more than 1 additional treatment in a year using standard diagnostic criteria," adding that "[s]o that's really better to understand what the rate of retreatment might be than rather—rather than at 30 days." Defendant Kanes continued, stating:

> So we looked for where our triggers of true MDD, where patients actually have recurrence of symptoms. And as I said, 50% of patients didn't require any additional therapy over the course of the year, and 70% required—excuse me, 70— the additional 20% only required 1 additional treatment. So a really durable response and an important option for patients if approved.

147.    Additionally, Defendant Greene added:

> [J]ust to highlight, what's remarkable there, again, 70% of patients, that was a 30-milligram group, only required 1 or 2, 2-week courses. So that's 4 weeks of drug out of 52 weeks, being drug-free for the rest of the time. That's important to patients. And what's really critical and often missed here, not by physicians per se, is that they know they're off drug, and yet they're still maintaining that benefit. It's almost a reverse placebo effect, if you will.

148.    Finally, Defendant Greene emphasized zuranolone's "durable effects out to day 42," while Defendant Kanes added that the "data continue to support what we've known about this drug for quite some time: rapid, very large effects and durable effects that we can use to treat patients episodically."

149.    Moreover, Defendant Kanes asserted that "the metric of just trying to understand difference from placebo, it could be misleading. . . . What you need to look at is how large effect was there for patients, would they notice it. . . . Those large effects are what's different. Placebo will do what placebo does, but we're seeing some very dramatic and very different effects over a very short period of time. And it just bears repeating that we're talking about these effects being durable after only 2 weeks of therapy."

150.    Consequently, these disclosures led to a decline in the price of Sage's common stock by approximately 19.3%, falling from a closing price of $72.86 per share on June 14, 2021, to $58.80 per share at the close of trading on June 15, 2021.

151.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants caused the Company to withhold from investors the following material information: (i) the representations that WATERFALL met its primary endpoint overstated the significance of demonstrating short-term improvement in symptoms of depression; (ii) the durability of zuranolone was overstated; (iii) and the impact of the placebo response observed in the study, which materially undermined the purportedly positive results reported for zuranolone, was significantly understated;

152.    On July 13, 2021, Defendants Greene and Kanes appeared on behalf of Sage at the Cowen Psychedelics & Novel Mechanisms in Neuropsychiatry Summit, where they promoted the purported durability of zuranolone:

> And in study after study, we've been able to demonstrate that we're improving those core symptoms. And we're in a durable way, long after the patients have stopped taking medication. And we saw that in the WATERFALL study, perhaps most dramatically in our SHORELINE trial, which is where patients were treated for 2 weeks at a time, and we've seen that greater than 70% of patients needed no more than 2 treatments or 2 14-day course of treatments in a year. So really long, durable effects on depression, which we think is transformative for patients.

153.    In response to a question concerning "how [we should] be thinking . . . of the magnitude of the placebo effect that we saw" in the WATERFALL study, Defendant Greene asserted that "the totality of the data" demonstrated the drug's rapid efficacy, stating that a patient "might only need 2 or 4 weeks of therapy in the course of the year." He further contended that "even as robust [as] the placebo effect was, the drug effect was clear and in the range and held out

to Day 42."

154.    Additionally, Defendant Greene asserted that the Company possessed sufficient

data to support FDA approval:

What's important—and obviously, when you conduct the clinical studies, you want to minimize placebo so that you tease out the drug effect. We've done that. As early as January, Steve and I were saying to everybody, "All we're looking for is a statistically significant result at day 15 and no surprise on adverse event." We've got that along with the other positive study, the totality data, we believe we have an approvable package, and we stand on that today.

155.    In reply to a question concerning "the sort of decline of effect at day 42" and

whether that "means there is no discernible effect at that time point," Defendant Kanes stated:

What we're referring to here is something that's really important conceptually, which is rather than thinking about delta from placebo at day 42, we look to see whether patients maintain their benefit. And what we said is that when you look at the overall change from baseline at the end of treatment, you carry that out through day 42 and you look at whether or not those numbers are the same.

So it's 2 things we learned. One, those numbers are not statistically different. So we know that patients aren't having statistically significant changes in their overall change from baseline. The other is that if you just use the raw numbers, it's 87% of the benefit that they had seen at day 15.

156.    The statements made above were materially false and/or misleading, as they

omitted to disclose material adverse facts concerning the Company's business, operations, and

future prospects. In particular, the Individual Defendants caused the Company to withhold from

investors the following material information: (i) the reported efficacy and durability of zuranolone

were materially overstated; and (ii) the significance of the placebo effect observed in the

zuranolone study was materially understated.

157.    On August 3, 2021, Sage submitted its Quarterly Report on Form 10-Q with the

SEC for the second quarter of 2021 (the "2Q21 10-Q"), issued a press release filed on a current

report on Form 8-K with the SEC summarizing the Company's second quarter 2021 financial

results (the "2Q21 Press Release"), and conducted a related earnings call (the "2Q21 Earnings

Call").

158.    The 2Q21 Press Release reiterated the previously disclosed topline findings from the WATERFALL study.

159.    Additionally, the 2Q21 Press Release disclosed that the Company was "formally terminating the REDWOOD and RAINFOREST Studies, which were suspended in the first quarter of 2020," and explained that "[a]fter discussions with the FDA, Sage does not believe that these studies will be required for a potential NDA submission."

160.    Regarding the KINETIC study, the 2Q21 Press Release stated that "SAGE-324 demonstrated a statistically significant reduction from baseline in the TETRAS Item 4 upper limb tremor score at Day 29 . . . [as] compared to placebo," and further noted "a statistically significant correlation between TETRAS tremor score and [ADL]."

161.    Furthermore, the 2Q21 Press Release announced that the Company was actively conducting the PARADIGM and LUMINARY studies to evaluate SAGE-718.

162.    During the 2Q21 Earnings Call, Defendant Greene reaffirmed that the Company "saw a clear maintenance of effect through day 42, 4 weeks after treatment was stopped. . . we believe we have the efficacy data in hand to file the first NDA for zuranolone."

163.    Concerning the Company's decision to terminate the REDWOOD and RAINFOREST studies, Defendant Greene stated:

> As you may recall, REDWOOD was designed to study fixed schedule intermediary dosing of zuranolone throughout the course of the year. We believe data from the SHORELINE Study address this question. [Because] RAINFOREST was designed to investigate the efficacy and safety of zuranolone in comorbid MDD and insomnia, while zuranolone has consistently improved sleep across clinical studies as measured by sleep component of the HAM-D scale, we do not believe RAINFOREST is required for initial filing.

164.    Subsequently, Defendant Kanes referenced the WATERFALL study and reiterated

that "patients who responded to zuranolone after 2 weeks of treatment retained on average more than 85% of their improvement through the end of the trial."

165.    Additionally, Defendant Kanes reiterated the view that "the data we've generated to date" along with "ongoing pharmacology studies" were sufficient to support "the regulatory NDA filing pathway."

166.    Further, Defendant Kanes stated that in the CORAL study, "we expect to see [a] consistent efficacy profile supporting the differentiated benefit/risk of zuranolone in this trial, including rapid onset of effect," and emphasized that "[t]he positive results from the WATERFALL Study, we believe, have sufficient efficacy data to support our first FDA filing for zuranolone."

167.    In response to an inquiry regarding whether the CORAL study would be required for zuranolone to obtain FDA approval for the treatment of MDD, and whether "the FDA had indicated that SHORELINE would provide sufficient retreatment data for the [NDA] filing" in light of the "decision to terminate REDWOOD and RAINFOREST," Defendant Greene stated that the Company was "in an ongoing dialogue" with the FDA and could "confirm REDWOOD and RAINFOREST would not be required for this filing," further asserting that the SHORELINE study data were sufficient "to provide the retreatment evidence."

168.    Moreover, Defendant Greene stated that zuranolone was designed as a "2-week therapy" for the treatment of MDD, emphasizing that "most of the improvement happens within the first week," with additional gains observed "[b]y the end of 2 weeks" and "somewhere between 40% and 50% remission." He further explained that "the time limited aspect of this is what got the FDA's attention [and] is why we have a breakthrough [designation] in the first place."

169.    The statements made above were materially false and/or misleading, as they

omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants caused the Company to withhold from investors the following material information: (i) references to non-public interactions with the FDA created a misleading impression that the Company's prospects for obtaining regulatory approval of its drug candidates were stronger than they actually were, thereby improperly instilling confidence in investors; (ii) statements suggesting that the Company had already generated sufficient data to support FDA approval were materially false and misleading.

170.    On August 11, 2021, Defendant Greene appeared on behalf of Sage at the Canaccord Genuity Growth Conference, where he dismissed the host's suggestion that zuranolone demonstrated comparable effectiveness to placebo at Day 42 as "a big misinterpretation." He explained that "most of those patients at day 42 were as well or better than they were at day 15. . . clearly, we have an overperforming placebo that throws off the graph." Defendant Greene also reiterated that "what's really interesting about SHORELINE, and it's unique in the study of depression, is it's almost a reverse placebo effect."

171.    Additionally, Defendant Greene stated that the Company "sat down with the agency . . . and all appreciated that we have a drug, zuranolone, that works."

172.    Moreover, Defendant Greene asserted that "[w]e have the efficacy data we need for filing" and that Sage had "confirmed" with the FDA "that statistical significance at day 15 is not necessarily a requirement for [the NDA's] filing." Defendant Greene further stated:

> So what we believe we have today is we have the efficacy data for a fileable package now that we have that next complete positive Phase III with WATERFALL. So we have the efficacy package. We've said -- we said at the beginning of the year, and we sort of have tried to repeat this, we chose to rerun the pharmacology studies at 50 milligrams. We had the 30-milligram complete, but we're rerunning them at 50. Those studies will be done kind of at the end of the year."

Why? We didn't want to leave any room for interpretation about any boxes that didn't get checked as we filed for the NDA. This is a large indication, millions of patients. So we want to make sure that we provide the highest quality data package. We expect no surprises with the repeat pharmacology studies. And then because it's in zuranolone's best interest because of the clean safety profile, our intention is to take a blinded look at all safety on ongoing clinical studies as part of the package.

Now we expect CORAL to be complete as we've guided. So with a complete CORAL, both efficacy and safety, that will get integrated into the package. But we've said historically, and we confirmed this with the agency, that unless we see some strange pattern, it doesn't work on day 3, 8, 12 or 15, that statistical significance at day 15 is not necessarily a requirement for filing. We have the efficacy data we need for filing. This is yet another study.

173. When asked about the Company's interactions with the FDA and whether Sage was

"completely on board with the regulatory requirements," Defendant Greene responded:

[G]iven the breakthrough status that we have with zuranolone and given the way breakthrough works, there's ongoing discussions with the agency. Some of those discussions are more strategic, which leads to decisions to not run certain trials, like you mentioned.

Some of the more tactical, in terms of dates and time and sort of administratively, do we do a rolling submission? Do we do a full submission? The kind of formal meeting where we do the official Type B NDA meeting, that's coming up in kind of weeks, not months. And once we have that formal meeting with sort of everybody present that locks in the data sets, all the administrative steps, as we've said before, we'll come out in a Reg FD format with Biogen and clarify what we believe we and the agency have agreed for the path forward. I do expect it to be as we've already articulated.

174. The statements made above were materially false and/or misleading, as they

omitted to disclose material adverse facts concerning the Company's business, operations, and

future prospects. In particular, the Individual Defendants caused the Company to withhold from

investors the following material information: (i) the Company's representations concerning the

likelihood of FDA approval for zuranolone were materially overstated; and (ii) statements

suggesting that the Company already possessed sufficient data to obtain FDA approval, regardless

of the outcome of ongoing or future clinical trials, were materially false and misleading.

56

175.    On September 10, 2021, Defendant Greene participated in the Morgan Stanley Global Healthcare Conference, where he reiterated that zuranolone "works rapidly" and asserted that "we see durable responses based upon the WATERFALL study and the SHORELINE study."

176.    Regarding the Company's non-public communications with the FDA, Defendant Greene stated that "[w]hat the team did with the agencies [is] designed 3 different Phase IIIs, any one of which [if] hit based upon the rest of the data led to a fileable package, 2 in MDD and 1 in PPD," further noting that Sage "talked to the agency about 4 different times" in the course of developing these three regulatory pathways, "any one of which [if] hit gave us a viable package."

177.    Regarding the Company's non-public communications with the FDA, Defendant Greene stated that "[w]hat the team did with the agencies [is] designed 3 different Phase IIIs, any one of which [if] hit based upon the rest of the data led to a fileable package, 2 in MDD and 1 in PPD," further noting that Sage "talked to the agency about 4 different times" in the course of developing these three regulatory pathways, "any one of which [if] hit gave us a viable package."

178.    On November 2, 2021, Sage submitted its Quarterly Report on Form 10-Q with the SEC for the third quarter of 2021 (the "3Q21 10-Q"), issued a press release filed on a current report on Form 8-K with the SEC announcing its third quarter 2021 financial results (the "3Q21 Press Release"), and conducted a corresponding earnings call (the "3Q21 Earnings Call").

179.    The 3Q21 Press Release included a statement from Defendant Greene describing "a successful pre-NDA meeting with the FDA for zuranolone," in which he expressed that, "we're excited to have reached alignment with the Agency and to have what we believe is a clear, efficient path forward for zuranolone." The press release further stated:

> The meeting reinforced Sage's belief that data from the MDD-201, ROBIN, and WATERFALL Studies and the Shionogi Phase 2 study along with supportive data from the MOUNTAIN Study will be sufficient for Sage to file in MDD. The planned initial NDA will focus on MDD and will also include data from the

ongoing pharmacology and clinical studies (CORAL and SHORELINE Studies).

180.    The 3Q21 10-Q noted, with respect to Auvelity (AXS-05), that "[i]n April 2021, Axsome Therapeutics, Inc. announced that the FDA had accepted and granted priority review to the NDA package for its NMDA receptor antagonist, AXS-05, which received Breakthrough Therapy designation for MDD in March 2019."

181.    The 3Q21 10-Q omitted to disclose the material risk that Auvelity posed to Sage's ability to obtain FDA approval for zuranolone, as well as the potential impact on the drug's commercial viability.

182.    The 3Q21 10-Q disclosed that the primary endpoint for the CORAL Study (HAMD-17 change from baseline) would be assessed at Day 3 rather than Day 15. It further described CORAL as "an adjudicative use study in MDD designed to demonstrate the benefit of zuranolone when co-initiated with a new antidepressant therapy."

183.    During the 3Q21 Earnings Call, Defendant Greene commented on the Company's pre-NDA meeting with the FDA, stating:

> This year and quarter have been marked by significant progress for Sage. We recently announced that following a pre-NDA meeting with the FDA, we and Biogen plan to submit an NDA for zuranolone in MDD in the second half of 2022, with an additional associated submission in PPD in the first half of 2023. We're pleased that we've reached alignment with the agency and believe we have a clear path for this submission. This brings us one step closer toward our goal of helping patients suffering from MDD and PPD.

184.    Defendant Greene further explained that Sage "met with the agency in early 2020 and designed 3 distinct Phase III studies, 2 in MDD and 1 in PPD… The plan set in motion was for a positive study from any 1 of the 3 paths to support an NDA filing and subsequent approval since it will provide the third positive pivotal study." Defendant Greene continued, stating:

> Based on the positive results from the WATERFALL study, we believe that we have the necessary data to submit an NDA for zuranolone. And we're delighted that

our recent pre-NDA meeting with the FDA reaffirmed that belief. And now, in fact, we have 4 positive studies: MDD-201B, ROBIN, WATERFALL and the Shionogi Phase II study. The data we have generated in clinical development to date support our belief in the overall benefit risk of zuranolone.

185.    Defendant Greene reiterated that the Company did "not believe CORAL efficacy data will be required for the MDD filing pathway," and asserted that the data from the study would simply "contribute to [the] overall safety database regardless of the outcome of the primary endpoint."

186.    Defendant Doherty stated that the modification of CORAL's primary endpoint was "in line with the goal of the study to demonstrate the rapid onset of zuranolone."

187.    Defendant Greene expressed confidence in the Company's prospects for obtaining FDA approval, asserting that "the totality of data" purportedly demonstrated that "zuranolone has consistently demonstrated rapid and sustained reductions in depressive symptoms and a well-tolerated safety profile without the adverse events that are often associated with discontinuation of standard of care [antidepressant treatments]."

188.    Defendant Doherty then referenced the KINETIC study, stating that the "statistically significant correlation between TETRA [sic] scores and activities of daily living observed at every time point" constitutes "an important finding that demonstrates the reduction in tremor seen with SAGE-324 in the study translated to meaningful effects for patients."

189.    n response to a question regarding whether "the CORAL primary endpoint change" was "FDA-driven or Sage-driven," Defendant Greene indicated that the change was made following FDA "feedback." He explained that "we sought overall feedback on the CORAL study, statistical analysis plan from the agency. And after that feedback, we selected . . . the day 3 endpoint as the key primary endpoint really to get back to the original idea of the CORAL study, which is to demonstrate . . . the rapid relief of depressive symptoms early in clinical trials."

Defendant Greene further reiterated that the Company "already had the efficacy data in hand for filing," which "allowed us now to move the primary endpoint to CORAL II to day 3."

190.    Defendant Greene indicated that the Company's discussions with the FDA during the pre-NDA meeting suggested that Sage would need to emphasize the speed of zuranolone's therapeutic effect. He stated, "we believe after the pre-NDA meeting that we have, the package to file, so it was important for us to have day 3 reflect that rapid onset."

191.    When asked further whether the Company's discussions with the FDA suggested that "statistical significance at [] later time points isn't really a hurdle," Defendant Greene responded that "clinical significance at the later third point is not required. What the agency and what physicians look for is consistent and durable impact without a rapid return to baseline," further noting that among 4,000 patient subjects, "we've seen rapid benefit at day 3 with continued benefit out to day 42, and again, on SHORELINE, even longer term feedback."

192.    An analyst then conveyed uncertainty as to why the Company was not relying on the existing Day 3 efficacy and response data for its NDA submission if "we knew all along that day 3 will show statistical separation," further inquiring, "[w]hy do you guys keep saying that we shouldn't—we don't need it," and "why change it so close to [the] rolling NDA [submission]?" In response, Defendant Greene stated:

> I'll remind you that in 2020, our team sat down with the agency following a number of Phase III studies, one, recognizing that MDD was the major unmet need and, in fact, a growing unmet need. So we and the agency and others appreciated that we needed something in addition to the currently approved antidepressants where we haven't seen a change in benefit/risk in a long time, and designed the LANDSCAPE and NEXT programs, 2 MDD studies and 1 PPD study. And we highlighted, and this is going back to consistent with our guidance in January that we needed 1 more positive study to have the package to file. We've got that and more we got the Japanese positive study as well.
>
> So we sat down with the agency in our pre-NDA meeting and confirmed that, that data package was sufficient for filing and that another Phase III was not required.

But there was a dilemma in front of us, as we highlighted. We had 2 ongoing Phase III studies. So we had what I thought was a very good open strategic discussion with the agency, which said like, 'CORAL's coming up, let's file for MDD.' We're going to include CORAL in the filing, but the efficacy data is not necessarily required to be positive to file.

Now the change to day 3 will benefit us if, in fact, day 3 is positive, and we see benefit over the treatment course. Those data will be incredibly important to guide our medical affairs force, our sales force in educating physicians about the appropriate use of zuranolone, including the totality of data.

193.    The statements issued by the Individual Defendants between September 10, 2021 and November 2, 2021 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects for many of the same reasons that the Individual Defendants' previous statements were misleading. In addition, the Individual Defendants referenced non-public and unverifiable communications with the FDA to justify changing the CORAL study's primary endpoint from Day 15 to Day 3. Day 15 was the MOUNTAIN study's unsatisfied primary endpoint from years earlier and the Individual Defendants knew that zuranolone could meet the new primary endpoint of Day 3.

194.    On November 15, 2021, Defendant Greene appeared on behalf of Sage at the Stifel Healthcare Conference, where he asserted that "we feel like we've gotten real good strategic alignment with the [FDA] and real good clarity on moving forward."

195.    In response to a question regarding "CORAL and the recent change that you made at day 3," Defendant Greene merely restated that the Company had "3 different Phase III studies, 2 in MDD, 1 in PPD that we believed [if] any one of which is positive gave us the filing package."

196.    Later in the conference, Defendant Greene continued to downplay the correlation between zuranolone and placebo, emphasizing that "there's evidence that these patients get better and stay better" and stating that "that's what" the FDA and others are "looking for."

What we're looking at and what medical folks believe and the agency believes is

that if someone can get better and stay better, that's what we're looking for. Having a robust placebo effect, which we're seeing across all depression trials is a part of running depression trials. It's inappropriate to use the words, the drug loses effect.

In fact, at day 42, we saw 86% of the day 15 effects. The drug is not losing effect, having low dose placebo narrows that. Now what we don't want to see and we're not seeing this is that someone gets better, they stay better at 15. And then as soon as they're off the drug, they quickly rebound back to baseline.

197.    Regarding SAGE-718, Defendant Greene remarked that "if you think about what we saw with Huntington's Disease, not only did they [patients] not get worse, they got better in 2 weeks, which is quite remarkable. We saw that repeating in Parkinson's. . . . SAGE-718 is fundamentally overlooked in terms of the massive value it can create."

198.    Defendant Greene conveyed a comparable level of confidence in relation to SAGE-324:

> [R]ight now, we're initiating a Phase II study testing various doses and frequency so that we believe that in addition to that 35% to 45% decrease in essential tremor, which also led to an improvement of activity with daily living that we have a drug that people can take chronic. So that's what we're studying now. We're very confident based upon our read of the data that we'll get there. They'll have both efficacy and then the drug that someone can take chronically because it is a condition that requires chronic administration.

199.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants caused the Company to withhold from investors the following material information: (i) materially overstated the efficacy and durability of the Company's three primary drug candidates; and (ii) represented that the change to CORAL's primary endpoint was solely intended to support existing data, while failing to disclose that such data may not have been independently sufficient to secure FDA approval.

200.    On December 1, 2021, Sage issued a press release, filed as part of a current report on Form 8-K with the SEC (the "December 1, 2021 Press Release"), which presented results from

the Company's SHORELINE study evaluating zuranolone. The press release acknowledged mild side effects, including "somnolence, dizziness, sedation, and tremor." It also quoted Defendant Greene as making the following statement regarding the purported efficacy of zuranolone:

> We believe zuranolone has the potential to offer an innovative treatment approach that may enable patients with MDD to experience reductions in depressive symptoms quickly, achieve related improvements in functioning and well-being, and maintain long treatment free intervals without the types of burdensome side effects that are often associated with discontinuation of standard of care antidepressants.

201.    On the same day, Defendant Greene appeared on behalf of Sage at the Piper Sandler Healthcare Conference, where he discussed the SHORELINE study results. During his remarks, he stated that the safety profile of the 50 mg dose of zuranolone was "very much like" that of the 30 mg dose.

202.    Defendant Greene also reiterated that, according to the Company's communications with the FDA, there were three potential pathways to obtain approval for zuranolone: "two in MDD and one in PPD." He further stated, "[w]ith the positive WATERFALL [trial results], we confirmed with the FDA in our pre-NDA meeting that WATERFALL plus the rest of the data was sufficient for filing [the NDA], so we're moving forward."

203.    In response to an inquiry about what the "FDA [will] focus on" in evaluating zuranolone for approval, Defendant Greene stated that "we know from discussions with the agency and as evidenced actually by the ZULRESSO AdComm, that what they're looking for is a rapid response and a sustained response without rebound." He further asserted, "so we do have that in all of our trials out at day 42 . . . both the physician assessment but, even more importantly, the patient-blinded assessment suggest that those on drug stay better and are statistically significantly better at day 42."

204.    The statements made above were materially false and/or misleading, as they

omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants caused the Company to withhold from investors the following material information: (i) materially overstated both the efficacy and safety of zuranolone; and (ii) made materially misleading statements by suggesting that patients treated with zuranolone "are statistically significantly better at day 42." Zuranolone did not demonstrate statistical significance at Day 42 in the treatment of MDD; rather, statistical significance was observed only at earlier time points, such as Day 3, in the WATERFALL study, as disclosed by the Company on December 8, 2021.

205.    On January 10, 2022, the Company filed a current report on Form 8-K with the SEC, which included a presentation prepared for use at the 40th Annual J.P. Morgan Healthcare Conference.

206.    The presentation featured a slide stating that zuranolone's "sustained effects lasted beyond completion of treatment."



207. The presentation further highlighted zuranolone's purported "sustained effects," suggesting that the treatment continued to provide therapeutic benefits following the completion of the dosing period.



208. The presentation stated that both the 30 mg and 50 mg doses of zuranolone demonstrated superior efficacy compared to placebo.



209.    The presentation emphasized the purported efficacy of zuranolone in addressing symptoms of both depression and anxiety.



210.    The presentation projected that the t19.4 million adults with MDD could represent potential candidates for zuranolone treatment. It also promoted the efficacy and commercial potential of SAGE-718 and SAGE-324. For instance, the presentation estimated that the combined market size for patients with Huntington's disease, Parkinson's disease, and Alzheimer's disease exceeded 140 million individuals.

211.    The presentation emphasized that SAGE-718 had "demonstrated improvements in cognitive function in early clinical trials."



212.    The presentation estimated that approximately 136.4 million individuals are affected by either essential tremor or Parkinson's disease. It further asserted that "[i]mprovement in tremor control and ADL score [was] observed in the KINETIC Study" of SAGE-324.



213.    The presentation included statements that were materially false and misleading, and

omitted material adverse facts necessary to make those statements not misleading. Specifically, the presentation overstated the efficacy of zuranolone, SAGE-718, and SAGE-324 by relying on data from studies that were not designed to assess long-term efficacy. For example, the SHORELINE study, referenced in the presentation, was structured only to "evaluate efficacy in an observational manner," thereby preventing the Company from drawing statistically significant conclusions from its findings.

214.    During the conference, Defendants Greene, Iguchi, and Doherty referred to the presentation and reiterated the materially false and misleading statements it contained.

215.    Defendant Greene underscored "the rapid reduction in depressive symptoms we've seen with zuranolone in clinical trials in MDD and PPD to date," and emphasized "significant reductions in depressive symptoms" after just "1 or 2 evening oral doses, and of course, robust reductions at day 15." He further asserted that the "integrated analysis from [Sage's] completed pivotal placebo-controlled study in MDD and PPD" showed that "patients who received zuranolone demonstrated statistically significant improvements from baseline across assessments of well-being and functioning at both day 15"—noted as "a day off drug"—and Day 42, "compared to patients who received placebo."

216.    Comparing zuranolone to FDA-approved treatments for MDD, Defendant Greene stated that zuranolone's "potential benefit risk profile . . . may be distinct from current antidepressants The integrated response and discontinuation data generated with zuranolone

217.    With respect to the Company's two other primary drug candidates, Defendant Greene stated that "SAGE-718 has demonstrated improvement on important test of executive function across multiple studies," and that SAGE-324 exhibited "statistically significant reductions in tremor as measured by TETRAS upper limb tremor score . . . through day 29," as

well as "statistically significant improvements in activities of daily living as measured by the TETRAS-ADL scale."

218.    During the conference, the host inquired about "the rationale of moving the primary endpoint [for CORAL] from day 15 to day 3," and the significance of "later time points, day 15 as well as day 42, both to physicians and to regulators when it comes to assessing the profile of zuranolone." In response, Defendant Greene stated that "in 2021, we had a good meeting with the FDA about the totality of zuranolone data," and that "in conjunction with the agency, [we] designed 3 Phase IIIs, 2 an MDD called LANDSCAPE, 1 in PPD called NEST, that the agency guide us if any 1 of which of these Phase IIIs was positive, we had a fileable package." Defendant Greene further noted that the Company "had a meeting with the FDA" in late 2021, where "we confirmed that a positive WATERFALL presented a fileable package" and "confirmed that the agency would like us to start the rolling [NDA] submission." He elaborated, clarifying that selecting Day 3 as the primary endpoint for CORAL helped reinforce zuranolone's rapid efficacy. Defendant Greene referenced the Company's experience with Zulresso, stating that "we know this from the ZULRESSO experience we had, where what regulators are looking for is consistency or durability of effect irrespective of what placebo does"—namely, the absence of "a rebound of effect."

219.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants caused the Company to withhold from investors the following material information: (i) materially overstated the efficacy and durability of the Company's three primary drug candidates; (ii) referenced Zulresso to foster public confidence in the Company's ability to obtain FDA approval for zuranolone, which was

misleading because Zulresso is a fundamentally different medication, approved exclusively for the treatment of postpartum depression (PPD), and, at the time of its approval, was the only therapy available for that condition.

220.    On February 16, 2022, Sage issued a press release (the "February 16, 2022 Press Release") and held a conference call with analysts (the "February 16, 2022 Analyst Call") to present and discuss the topline results from the CORAL study evaluating zuranolone for the treatment of major depressive disorder (MDD).

221.    The February 16, 2022 Press Release announced that zuranolone met both its primary and key secondary endpoints in the CORAL study. Specifically, it stated that "at the Day 3 primary endpoint, zuranolone 50 mg co-initiated with a standard of care antidepressant showed a statistically significant reduction in depressive symptoms," and that for the key secondary endpoint, "zuranolone co-initiated with an antidepressant was statistically significant in reducing depressive symptoms compared to an antidepressant co-initiated with placebo over the 2-week treatment period." The release further noted that "[o]ther secondary endpoints demonstrated a statistically significant reduction in HAMD-17 score in the zuranolone co-initiated with ADT [antidepressant] arm compared to the ADT arm at Days 8 and 12, while Day 15 demonstrated numerical superiority and Day 42 showed equivalence."

222.    The February 16, 2022 Press Release included a statement from Defendant Greene, who was quoted as saying:

> We believe the CORAL Study is clinically meaningful and with the addition of this data the LANDSCAPE program now demonstrates zuranolone has three potential real world uses for the treatment of MDD. The LANDSCAPE data support zuranolone as a monotherapy, and since many people in the previously completed studies were already on maintenance ADTs, we believe our data also support zuranolone as additive therapy. The CORAL Study further supports the use of zuranolone to accelerate the benefit of conventional ADTs in treating MDD with a well-tolerated safety profile," said Barry Greene, Chief Executive Officer at Sage.

"Including the CORAL Study, zuranolone now has six positive clinical studies, and we remain on track to start the rolling submission for a New Drug Application in MDD early this year with completion targeted for the second half of 2022.

223. During the February 16, 2022 Analyst Call, Defendant Greene reiterated the topline results from the CORAL study, stating that "zuranolone co-initiated with standard-of-care antidepressants or ADTs met the primary endpoint," by "demonstrating a statistically significant reduction in HAMD-17 scores at day 3 . . . [as] compared to standard-of-care antidepression co-initiated with placebo." He further represented that the key secondary endpoint was achieved, citing "a statistically significant improvement in depressive symptoms . . . over the 2-week treatment period," which he claimed indicated that "zuranolone showed continuous benefit over the treatment period." Defendant Greene also asserted that there were "no new safety signals [were] attributable to zuranolone."

224. Defendant Greene once again referenced the Company's interactions with the FDA, stating:

> [F]ollowing our pre-NDA meeting with FDA in late 2021, we confirmed our belief that we had the data needed to submit an NDA for MDD for zuranolone. Given our confidence in the data package to support the filing, we announced that the primary endpoint in the CORAL Study will be measured at day 3 because we believe that demonstrating rapid reduction in depressive symptoms at day 3 is an important differentiator and informs potential real-world use of zuranolone.

225. With respect to zuranolone's side effect profile, Defendant Doherty stated that "adverse events reported in the study were mild or moderate in severity, consistent with previous data in the LANDSCAPE program," and emphasized that "importantly, there were no signals for increased suicidality or withdrawal symptoms in the study." Defendant Doherty also highlighted zuranolone's "rapid and sustained efficacy."

226. Defendant Greene asserted that zuranolone's "rapidity of effect," especially for "MDD [patients] with elevated anxiety," serves as "a real differentiator" compared to currently

available treatments for major depressive disorder. He noted that "it takes 6 to 8 weeks for people to see benefit" from existing MDD medications and that patients frequently "drop off" those treatments before experiencing relief "because of side effects."

227.   Also during the February 16, 2022 Analyst Call, Defendant Benecchi emphasized zuranolone's "sustained or durable effect over time" and its favorable "safety profile." Addressing the prevalence of major depressive disorder accompanied by elevated anxiety, Defendant Benecchi stated that the patient population ranges from "54% to 66% of [MDD] patients cited in [the] studies" and "in excess of 70%" among MDD patients "in the real world, as you talk to practicing clinicians." He concluded that zuranolone "for the first time, gives [clinicians] the opportunity to treat a patient with MDD with elevated anxiety in a way that provides that rapid and durable effect over time through a short course without the stigmatizing side effects of sexual dysfunction and weight gain that they see with other ADTs."

228.   Subsequently, during the February 16, 2022 Analyst Call, Defendant Greene stated that "after our pre-NDA meeting" in 2021, the Company determined that it "had the fileable package to move forward with" and then "confirm[ed] that with the agency," deciding "with Biogen, [and] the agency to have CORAL . . . show the rapidity of effect when co-initiated with an antidepressant." Defendant Greene further stated:

> [W]hen we met with the agency, they were very helpful in guiding us, suggesting that, look, we've got 2 outstanding Phase IIIs, one in MDD, one in PPD. Let's complete the MDD study, include that in the filing and file for MDD. And then once you complete the PPD study, file for PPD. And the window is such that we might be able to kind of launch both indications at the same time.

229.   In response to a question concerning efficacy retention in the CORAL study and its implications for regulatory approval, Defendant Doherty stated that Sage "didn't calculate it in this study," but asserted that "response retention would actually be over 100%" in terms of absolute

scores, as patients "continued to improve over the duration of the study."

230.    Despite the Individual Defendants' efforts to mitigate public concern regarding the disclosure that "Day 42 showed equivalence" in the CORAL study, the market reacted adversely to the news. Following the announcement, the price of Sage stock declined by approximately 22.8%, falling from a closing price of $43.50 per share on February 15, 2022, to $33.58 per share at the close of trading on February 17, 2022.

231.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants caused the Company to withhold from investors the following material information: (i) continued to reference non-public communications with the FDA in a manner that suggested the agency endorsed the methodologies employed in the Company's clinical studies, thereby fostering public confidence in the Company's prospects for obtaining FDA approval; and (ii) continued to materially overstate the efficacy of zuranolone while minimizing the significance of the placebo effect observed in the Company's clinical studies.

232.    On February 24, 2022, the Company filed its Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K") with the SEC. The report was signed by Defendants Greene, Iguchi, Jonas, Cola, Paul, Starr, Frates, Germano, Barrett, and Golumbeski. On the same day, the Company issued a press release, filed on a current report on Form 8-K with the SEC, announcing its financial results for the fourth quarter and full year 2021 (the "FY21 Press Release"), and held a corresponding earnings call (the "FY21 Earnings Call").

233.    The 2021 10-K persisted in citing Auvelity, yet omitted disclosure of the threat presented by the competitor to the Company's capacity to obtain FDA approval and to realize its

commercial potential.

234.    During the FY21 Earnings Call, Defendant Greene remarked that "up to 2/3 of people with MDD experience elevated anxiety symptoms." Defendant Doherty concurred, noting that MDD patients with elevated anxiety comprised "up to 66% of all MDD patients" who are "less responsive" to other treatments. Defendant Doherty further asserted that "WATERFALL and SHORELINE studies identified MDD with elevated anxiety at baseline as a subgroup that is particularly responsive to zuranolone."

235.    Reflecting Sage's renewed emphasis on MDD with elevated anxiety, Defendant Greene stated that the Company "did a retrospective analysis across our data and discovered that zuranolone was particularly useful in . . . MDD with elevated anxiety," which led Sage to "prospectively" incorporate "that subpopulation into the CORAL study." Defendant Greene reiterated that this subpopulation constitutes "about 2/3 of those annually diagnosed with MDD" and represented that "we have a very rich package for MDD with a pre-defined subpopulation [in] MDD with elevated anxiety" and that "we're quite enthusiastic about the regulatory path forward."

236.    Defendant Greene additionally asserted that Sage "reiterated the consistency of discussions we've had with the [FDA] that WATERFALL constitute a filing package." Regarding those communications, Defendant Greene indicated that, at the time, "there were 2 outstanding studies, 1 in [MDD] CORAL and one in PPD SKYLARK, and [the FDA] suggested and we agreed that we first filed an MDD, including the CORAL study and then with PPD, including the SKYLARK study."

237.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants caused the Company to withhold from

investors the following material information: (i) persisted in suppressing the risks that Auvelity posed to zuranolone's commercial potential and regulatory path, and (ii) repeatedly referenced the Company's engagements with the FDA in a manner designed to foster public confidence in Sage's likelihood of obtaining regulatory approval for its drug candidates.

238.    On March 7, 2022, Defendant Greene appeared on behalf of Sage at the Cowen 42nd Annual Healthcare Conference, during which the following dialogue transpired between the host and Defendant Greene:

**Conference Host:**

> The first issue is the zuranolone MDD filing. Now that you have CORAL successfully behind you, statistical significance, it doesn't look like there's anything there that is necessarily going to be problematic for the filing. But folks want to know what's left?

**Defendant Greene**

> So we're in really good shape with the planned rolling submission of the NDA for zuranolone, which as you know, we're developing for the treatment of MDD and PPD. If I just take a step back and set some context, we started last year highlighting that we had 3 ongoing Phase 3 studies, 2 in MDD and 1 in PPD, any one of which if positive, constitute a filing, a positive filing. With positive [WATERFALL] last year, we met with the agency in the fall for a pre-NDA meeting, a formal pre-NDA meeting. We confirm that [WATERFALL], [i]n fact, was the last remaining piece to start an NDA and we're in good shape to do that. And as you mentioned, having a positive CORAL as part of that NDA is very, very helpful and will be instrumental as we commercialize.

239.    Defendant Greene additionally referenced a previously undisclosed "Japanese study," conducted by Shionogi, which he described as "the only pure placebo-controlled study where zuranolone was studied [at dosage of] 20 and 30 milligrams and demonstrated clinically relevant and statistically significant improvement in depressive symptoms at day 3, 8 and 15." When asked whether "Shionogi is planning on presenting that [study] anywhere," Defendant Greene responded that he was not aware, stating that "[i]t's really up to them to present as with

many Japanese companies, they tend to be a little bit more conservative and really focus on kind

of the regulatory focus."

240.    Regarding the Company's communications with the FDA, Defendant Greene stated:

Well, we have the data to follow. When we met with the agency in the fall of last
year, we confirm that the efficacy studies that we talked about, overall safety in
over 3,500 patients was sufficient for filing. So we have the data we need to file
right now. What's important is the FDA has communicated that real-world
evidence increasingly plays a role as a component of regulatory decision-making.
So we're confident that SHORELINE, which is the largest prospective natural
study done to date in MDD really aligns with FDA's efforts to emphasize real world
evidence, and it's potentially transformative in the treatment of depression. So
we've got the data we need.

241.    Concerning the durability of zuranolone in the treatment of MDD, Defendant

Greene asserted that "a majority of patients take [the] drug for 2 weeks and are better for a long

period of time," subsequently clarifying that by "a long period of time," he was referring to "over

a year":

[W]hat I can say is that in the 50-milligram cohort, the majority of patients who
responded to the initial zuranolone treatment received only 2 courses across the
entirety of the year, 80% only needed 1 or 2 week courses. So that implies that
those that responded did well for a long period of time.

242.    The host requested clarification regarding the foregoing representation, stating: "It

sounds like you're saying that the average time point of redosing is further out. It's not close into

that original, it's further out." In response, Defendant Greene replied, "[w]e're not ready to present

that, but that's a good inference from the overall data set."

243.    Defendant Greene subsequently suggested that the FDA might elect not to convene

an Advisory Committee meeting in connection with zuranolone's NDA, stating, "[u]ltimately, it's

an agency decision whether to have an AdComm or not. If they do decide to have it, we'll embrace

it."

244.    With regard to SAGE-342, Defendant Greene expressed that the Company was

76

"highly confident looking at the data that we'll have a dosing regimen that provides coverage for essential tremor without any tachyphylaxis with a profile that allows some to [sic] standard drug for long periods of time without discontinuation rates."

245.    In connection with the Company's continued assessment of SAGE-718, the host cited Parkinson's and Alzheimer's Diseases, asking, "how much buy-in do you have from FDA on what the approvable endpoint for PD and AD cognition is." In response, Defendant Greene remarked that "we're very well aligned with the agency in terms of forging new pathways. So we're in good shape and moving forward."

246.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants caused the Company to withhold from investors the following material information: (i) exaggerated the effectiveness and persistence of zuranolone as evidenced by the Company's clinical trial results; and (ii) inflated the efficacy of SAGE-324 and SAGE-718 by representing that Sage was "highly confident" that SAGE-324 could address "essential tremor without any tachyphylaxis" and asserting that the Company was "well aligned with the [FDA] in terms of forging new pathways" for obtaining approval of SAGE-718.

247.    On April 28, 2022, Sage submitted a proxy statement on Form DEF 14A to the SEC (the "2022 Proxy Statement"), seeking shareholder authorization for, inter alia, (i) the reappointment of Defendants Frates, Golumbeski, and Starr to serve an additional three-year term on the Company's Board, and (ii) the approval of compensation for certain of the Company's executive officers, including Defendants Greene, Iguchi, Benecchi, Jonas, and Robichaud.

248.    With respect to the Company's internal controls and adherence to legal and regulatory obligations, the 2022 Proxy Statement represented that "the Audit Committee operates

under a written charter approved by the Board of Directors, which provides that its responsibilities include the oversight of the quality of our financial reports and other financial information and our compliance with legal and regulatory requirements," as well as "reviewing with management and our independent registered public accounting firm the adequacy of our internal controls over financial reporting."

249.    Concerning the Company's risk assessment and risk oversight functions, the 2022 Proxy Statement asserted:

> Our Board of Directors oversees the management of risks inherent in the operation of our business and the implementation of our business strategies. Our Board of Directors performs this oversight role by using several different levels of review. In connection with its reviews of our operations and corporate functions, our Board of Directors addresses the primary risks associated with those operations and corporate functions. In addition, our Board of Directors reviews the risks associated with our business strategies periodically throughout the year as part of its consideration of undertaking any such business strategies.

> Each of the committees of our Board of Directors also oversees the management of our risk that falls within the committee's areas of responsibility. In performing this function, each committee has full access to management, as well as the ability to engage advisors. Our Chief Financial Officer provides reports to the Audit Committee and is responsible for identifying, evaluating and implementing financial risk management controls and methodologies to address any identified risks. In connection with its risk management role, our Audit Committee meets privately with representatives from our independent registered public accounting firm, and privately with our Chief Financial Officer. The Board of Directors evaluates from time to time the processes by which our exposure to risk is assessed and managed by management. In addition, the Audit Committee assesses our financial controls, legal and compliance risks, business and operational risks, and cybersecurity risks. As part of this oversight, the Audit Committee receives periodic reports from management on such risks at its regularly scheduled meetings, evaluates actions management has taken to limit, monitor or control such risk exposures, and provides periodic updates to the full Board of Directors.

250.    With regard to the WATERFALL study, which involved "evaluating zuranolone 50 mg in adults with MDD," the 2022 Proxy Statement disclosed that the study "met its primary endpoint."

251.    Regarding the KINETIC study of SAGE-324, the 2022 Proxy Statement stated that the study "had achieved its primary endpoint."

252.    The 2022 Proxy Statement emphasized "multiple development milestones in 2021 evaluating SAGE-718 for the treatment of cognitive impairment associated with Huntington's disease, Parkinson's disease, and Alzheimer's disease, including receipt of Fast Track Designation for SAGE-718 in the treatment of Huntington's disease."

253.    On May 2, 2022, the Company released a press statement announcing the commencement of the rolling submission of the New Drug Application (NDA) seeking FDA approval of zuranolone for the treatment of MDD. Sage indicated that it anticipated finalizing the NDA submission for zuranolone in MDD during the second half of 2022, to be followed by a submission for PPD in the first half of 2023.

254.    On May 3, 2022, Sage submitted a quarterly report on Form 10-Q to the SEC for the first quarter of 2022 (the "1Q22 10-Q"), published a press release filed as part of a current report on Form 8-K with the SEC, disclosing the Company's financial results for the first quarter of 2022 (the "1Q22 Press Release"), and conducted a corresponding earnings call (the "1Q22 Earnings Call").

255.    The 1Q22 10-Q included the following disclosure regarding Auvelity:

In April 2021, Axsome Therapeutics, Inc. announced that the FDA had accepted and granted priority review to the NDA package for its NMDA receptor antagonist, AXS-05, which had previously received Breakthrough Therapy designation for MDD, but the expected Prescription Drug User Fee Act target action date of August 2021 has been delayed. In April 2022, Axsome announced that it had received and agreed to post-marketing requirements/commitments proposed by the FDA with respect to AXS-05 and in May 2022, Axsome announced that it anticipates potential FDA action on its NDA in the second quarter of 2022.

256.    During the 1Q22 Earnings Call, Defendant Greene sought to differentiate zuranolone from existing MDD therapies, asserting that "zuranolone's mechanism of action is

79

distinct from current antidepressants." He emphasized that "MDD studies to date . . . have included both patients with elevat[ed] anxiety as a symptom of their depression and those without symptoms of anxiety," suggesting that "zuranolone may be well suited to address a clear unmet need for people with MDD regardless of their baseline anxiety symptoms."

257.    Defendant Doherty conveyed similar confidence in the efficacy of zuranolone for treating patients with elevated anxiety, citing "conversations with the FDA to date" concerning zuranolone's potential approval for use in the treatment of PPD. He stated that "because PPD often presents very similar to MDD with elevated anxiety, we are encouraged by the positive results we've seen in patients with MDD presenting with elevated anxiety as a symptom of the depression in the LANDSCAPE program."

258.    An analyst subsequently posed a question concerning "potential dosing regimens" for SAGE-718, referencing "results in both Parkinson's and Alzheimer's suggesting a durable benefit beyond the dosing period." In response, Defendant Greene indicated that SAGE-718 "will be chronically dosed," and further remarked that "we don't see any kind of tolerability challenges or tachyphylaxis that would warrant any kind of periodic dose or dose disruption."

259.    Defendant Greene further represented that, with respect to zuranolone, patients experienced a reduction in adverse side effects upon redosing, asserting that "We have not seen any additive safety with retreat. In fact, of the adverse event numerically, [it] actually goes down with each and every course."

260.    Later during the 1Q22 Earnings Call, an analyst inquired about "the timing of PPD and MDD approvals" and whether the FDA might authorize zuranolone for PPD prior to MDD. In response, Defendant Greene stated that the Company was "very much aided by our strategic discussion with the agency in the fall of last year . . . we had alignment with the agency that we

needed one more positive study . . . the strategic discussion said, let's file MDD first . . . and then file PPD."

261.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants caused the Company to withhold from investors the following material information: (i) persisted in obscuring the risks that FDA approval of Auvelity posed to the Company's regulatory trajectory and commercial potential; and (ii) continued to exaggerate the safety and efficacy of zuranolone, as well as the sustained effectiveness of SAGE-718.

262.    On May 11, 2022, Defendants Benecchi and Robichaud appeared on behalf of Sage at the Bank of America Securities 2022 Healthcare Conference, where Defendant Benecchi opened by highlighting the benefits of a rolling submission, stating that it "allows us to get our material in front of the FDA as soon as possible."

263.    When asked "about the potential for having an AdComm," Defendant Robichaud identified "durability" and "utility" as factors that "are probably . . . very important" to the FDA, and noted that the FDA had convened an advisory committee meeting for Zulresso.

264.    In response to an inquiry concerning the durability of zuranolone, Defendant Robichaud stated:

> That's a fantastic question and one that we've evolved and learned as we've developed the molecule as well. We believe that patients don't want to be treated forever. You don't think of a depressed patient is now a press patient for life. We believe that depression is a disease, not who you are. What we found out through our clinical studies has been pretty consistent through all the clinical studies that we've conducted, is that a 2-week therapy of this in the vast majority of patients is all that is necessary to put their depression in some phase of remission, bring them to some level of relief from their depression. Will patients go back into depression, that possibility always exists.

81

Because of that question, we started a very complicated and very thorough clinical study called SHORELINE, which is a study that looks at if patients need to be redosed over the course of a year. And we allowed patients to be doses many times as necessarily during the course of the year. And we'll probably talk about it more in depth. But in general, patients in that entire clinical study required only 1 or 2 doses over the course of an entire year. So it's obvious to us that patients don't want to be treated chronically for a year, 2 years or longer on therapy, especially therapies with side effect profiles that aren't necessarily attractive to most patients. And what we found out in that study is they don't need to be. The vast majority of patients require 1 or 2 doses or dose regimens of the 2 therapy.

265.    Defendant Benecchi further asserted that zuranolone had the potential to alleviate depressive episodes in as little as "within 3 days" for certain patients, while providing others with sustained benefits absent the need for "perpetual therapy":

There are patients that are incredibly troubled by their MDD and they're looking for solutions. And for many patients, sometimes that solution is something that they can take and they can know within 3 days or so that the medication is going to deliver what they want.

In other cases, it's to have the efficacy and to really experience it without the stigmatizing side effects associated with other therapies like sexual dysfunction and weight gain. And sometimes, as Al mentioned, it's the opportunity to take a therapy to experience the relief and then not need to redose or retake the therapy for an extended period of time so they can get back to living the lives that they want to live in the absence of needing perpetual therapy.

266.    Defendant Benecchi additionally remarked:

There's been a lot of sameness in this space and the mentality has been treated to fail. The opportunity to send someone home with a product that they know in 3 days works, and that they can take over a short course that has lasting effect, as Al mentioned, with respect to the SHORELINE data with 80% of patients effectively being able to go 1 year, which has 2, 2-week courses without the tolerability profile that you see with other therapies like sexual dysfunction and weight gain. It's a profound game changer for them.

267.    Defendant Benecchi then addressed the potential market for zuranolone, describing it as "incredibly large" and estimating the population of "unresolved" MDD patients—a subset of the broader MDD population—at 6.8 million, in contrast to approximately 500,000 women affected by PPD.

268.    With regard to SAGE-718, Defendant Robichaud promoted its efficacy and differentiated it from competing therapies, stating:

> We've initiated a very thorough clinical examination of the effects of SAGE-718 in a number of different diseases associated with cognitive impairment, beginning with Huntington's disease, looking at Parkinson's disease as well as Alzheimer's disease. And just—I can briefly say that we've done open label studies in all of those diseases, and we've shown the effects of 718 on those 3 different diseases.
>
> And what we're seeing, thankfully, is a very similar effect on executive function and cognitive performance that is very much unlike what a lot of other companies are looking at today. We're looking at improving synaptic function and we're looking at improving the brain circuitry associated with cognitive decline. What we're seeing in a very short amount of time is improvements in, as I said, executive function and cognitive performance. That really encourages us about the utility of this molecule, not just any specific type of neurogenic disease but across a platform of diseases that have cognitive impairment as sort of a common alloy amongst them.

269.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. Specifically, the Individual Defendants continued to exaggerate the safety and effectiveness of zuranolone and SAGE-718.

270.    On June 1, 2022, the Company published a press release and conducted a conference call to announce positive findings from the SKYLARK study evaluating zuranolone in the treatment of PPD.

271.    During the call, an analyst observed that "the MDD opportunity is substantially larger than PPD" and inquired how the results from the SKYLARK study might "impact the probability of zuranolone approval in MDD." In response, Defendant Greene emphasized the Company's communications with the FDA, which "confirmed that with a positive WATERFALL [study], we had a fileable package for MDD," further stating that "the agreement with the agency was to move ahead with a rolling submission for MDD, . . . include the CORAL data, . . . [and] then [make] an associated NDA filing with the PPD data."

272.    In response to an inquiry regarding why the Company was "seeing a larger effect" from zuranolone in the treatment of PPD compared to MDD, Defendants Greene and Doherty refuted the notion that a difference existed. Specifically, Defendant Greene asserted that "we are seeing consistency of data in both PPD and MDD across 3,000 treated patients," while Defendant Doherty maintained that "[t]he only difference is really in the triggering," elaborating that, in the context of PPD, "it's the changes in physiology associated with parturition and birth where it's going to be more variable in MDD."

273.    On June 8, 2022, Defendants Greene, Benecchi, and Iguchi appeared on behalf of Sage at the Jefferies Healthcare Conference. During the event, the host remarked that "[y]ou guys have always been very confident that you're going to get approval" and inquired about the Company's "interactions with the FDA" and what "makes you feel very confident that you're aligned in terms of the path forward for this medication." In response, Defendant Greene stated:

> I think we've been working with the FDA, as you pointed out, significantly through these process even from the days when we were trying to move [Zulresso] forward spoke with the FDA very early about this approach to treating depression and the difference between the standard of care that exists today, a rapid onset, short duration treatment and durability of effect. And they've been very excited about working with us to allow us to at least get the studies needed to demonstrate that and ultimately bring the data forward that would convince them this actually is a differentiated product. So it's been, I would say, I've worked at large pharma companies and has been very different from my experience in those avenues where the FDA is encouraged or really wanted to work with us. And the CORAL study came out of discussions with the FDA about what to do and how we wanted the use case scenario. So they've been working very closely with us to help us think about gathering all the data necessary to inform patients, caregivers and physicians, but how this dose—how this drug could be use in depression and postpartum depression. And that's been our goal ever since and that's why we've done all these different studies with these different end points is to try and give as much data as possible to inform how to treat depression in a way that is very different, that's been done for the last several decades.

274.    The host then inquired as to how "the FDA interpreted" the data from the CORAL study, noting the Company's unexpected decision to revise the primary endpoint from Day 15 to

Day 3. In response, Defendant Greene asserted that "the real goal of the CORAL study was to demonstrate rapid onset" when co-administering zuranolone with another antidepressant, stating that "the 3-day endpoint was really meant to demonstrate that and very robustly did."

275. On June 13, 2022, Defendant Greene appeared on behalf of Sage at the Goldman Sachs Annual Global Healthcare Conference, where he addressed the Company's announcement made earlier that day regarding its decision to pursue a single NDA submission seeking approval of zuranolone for both MDD and PPD, rather than initially seeking approval for MDD followed by a separate submission for PPD. Defendant Greene explained that "accelerat[ing] the PPD aspect of the NDA . . . simplifies the review process," which is "better for us" and "the agency." He further elaborated that "by combining MDD and PPD, we strengthened the totality of data, particularly given how strong the SKYLARK study was," and added that the decision to file a single NDA "greatly strengthens the overall package and kind of the timely probability of approval by having a totality of the data."

276. Later during the conference, Defendant Greene again sought to differentiate zuranolone from existing antidepressant treatments, stating that the Company's drug "works particularly well in a group of patients where standard of care doesn't work that well . . . that's with MDD with elevated anxiety or as sometimes they're called anxious depression . . . those patients act a lot like the PPD patients."

277. Regarding the possibility that the FDA might opt not to convene an AdComm meeting for zuranolone, Defendant Greene stated that "they could decide that given the unmet need and given the benefit risk, then AdComm is not warrant[ed] to move forward for approval," further noting that, if such a meeting were held, the FDA would likely inquire whether the "onset of action [is] fast" and about "the durability of effect."

278.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants: (i) issued materially misleading statements asserting that "combining MDD and PPD . . . strengthened the totality of [the] data, particularly given how strong the SKYLARK study was," despite the fact that the SKYLARK study in PPD did not establish efficacy or durability in MDD, and that the two conditions are clinically distinct and necessitate separate treatment approaches. As such, the results from the SKYLARK study in PPD could not compensate for deficiencies in the Company's data concerning the use of zuranolone for the treatment of MDD.

279.    On August 2, 2022, Sage submitted a quarterly report on Form 10-Q to the SEC for the second quarter of 2022 (the "2Q22 10-Q"), published a press release that was filed as part of a current report on Form 8-K with the SEC, disclosing the Company's financial results for the second quarter of 2022 (the "2Q22 Press Release"), and conducted a corresponding earnings call (the "2Q22 Earnings Call").

280.    The 2Q22 Press Release cited Defendant Greene as stating, "[b]ased on the consistent clinical profile of zuranolone, we believe it has the potential, if approved, to address the significant unmet need for people suffering from MDD and PPD and we are working with a sense of urgency toward our goal of bringing zuranolone to them."

281.    The 2Q22 10-Q included the following disclosure concerning Auvelity:

In April 2021, Axsome Therapeutics, Inc. announced that the FDA had accepted and granted priority review to the NDA package for its NMDA receptor antagonist, AXS-05, which had previously received Breakthrough Therapy designation for MDD, but the expected Prescription Drug User Fee Act target action date of August 2021 has been delayed. In May 2022, Axsome announced that it anticipated potential FDA action on its NDA in the second quarter of 2022, which has not been updated.

282.     During the 2Q22 Earnings Call, Defendant Greene reiterated that "the totality of the data generated with zuranolone support [its] potential . . . as a rapidly acting generally well-tolerated oral therapeutic to treat" MDD and "PPD with sustained effect."

283.     Defendant Robichaud further asserted that results from the SHORELINE study "support our belief that zuranolone can have remarkable durability," and noted that for patients who were retreated with zuranolone in the SHORELINE study, "efficacy and safety outcomes were similar to those observed in the initial treatment course."

284.     Defendant Greene subsequently stated that the Company elected to discontinue the RAINFOREST study "in conjunction with the [FDA]," while indicating that data from both the RAINFOREST and REDWOOD studies would still be incorporated into the NDA. In response to an inquiry regarding his confidence in the Company's regulatory trajectory, Defendant Greene remarked, "we feel very good about . . . the traction we have with the agency. . . . I would say we're highly confident in the interactions we've had with FDA, stemming back to 2020 when we outlined the LANDSCAPE and NEST programs. We've confirmed multiple times with the agency, the totality of the data required for [the] NDA filing."

285.     Defendant Greene further represented that "there's regular interactions and updates with the FDA . . . formal and then the informal kind of e-mail interactions . . . and things are going well." Regarding the possibility of the FDA convening an AdComm meeting for zuranolone, Defendant Greene stated, "[i]f they don't want an AdComm and it signals speed of approval, that would be great."

286.     On August 9, 2022, Defendants Iguchi, Robichaud, and Benecchi participated in the Wedbush PacGrow Healthcare Conference on behalf of Sage. During the event, Defendant Robichaud stated that "it has been consistent with all of our studies that zuranolone . . . improv[es]

sleep in a lot of patients," describing the drug's "beneficial effects on sleep architecture" as a "major side-effect" that was advantageous for patients suffering from depression.

287.    The following day, Defendants Iguchi, Robichaud, and Benecchi participated in the Canaccord Genuity 42nd Annual Growth Conference on behalf of Sage. Following the event, Canaccord issued a report stating that Sage was "confident on [its] regulatory strategy" for zuranolone and further noted that "Sage appears very confident around its filing strategy for [zuranolone]," ultimately concluding that the Company "is significantly undervalued solely on the zura opportunity in MDD/PPD," with "no specific contribution from" other drug candidates in its development pipeline.

288.    On August 19, 2022, Axsome announced that it had obtained FDA approval for Auvelity for the treatment of MDD in adults, stating that Auvelity "is the first and only rapid acting oral medicine approved for the treatment of MDD with labeling of statistically significant antidepressant efficacy compared to placebo starting at one week" and "sustained at all subsequent timepoints." Axsome further disclosed that Auvelity "was statistically significantly superior to placebo in improvement of depressive symptoms as measured by the change in the [MADRS] . . . total score at Week 6," which was the "primary endpoint" of the drug's GEMINI study. Axsome also noted that Auvelity "uses the first new oral mechanism of action in more than 60 years for MDD."

289.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects.

290.    On September 12, 2022, Defendant Greene participated in the Morgan Stanley Global Healthcare Conference. When the host asked whether Auvelity's "approval changes your

view on the commercial potential for, or positioning of zuranolone at all," Defendant Greene responded:

> It doesn't. And I applaud [Axsome] for getting the drug approved. More options for patients are great. What [Axsome] to me signifies is yet another drug in the wave of getting patients better fast is good. They claim that patients are better in 1 to 2 weeks, which is fantastic, rather than waiting 6 to 8 weeks to get better. And we've already talked about this. The world of whether it's esketamine or psychedelic, get someone better fast without chronic treatment. But they had to get better fast. So I think it highlights a profile like zuranolone, which has been consistent now in 4,000 patients were more where after 2 evening doses of zuranolone, you feel better, take it for 2 weeks, get off drug, not wean off drug, stop drug and you feel better for long periods of time. The short line data, the largest natural study run is a good support of what this drug could do.

> That to me represents how the drug probably will behave in the real world, which is kind of an 80% response rate. And for those that responded, the majority didn't need another 2 weeks of drug for the full calendar year that we followed them, 80% required only 1 or 2-week course of treatment in the course of the year. So if you ask anybody living with depression, if they'd rather have 2 or 4 weeks of drug versus 365 days of drug, the answer is pretty self-evident.

291.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants: (i) materially misled investors by asserting that Auvelity "highlights a profile like zuranolone," thereby implying that Auvelity's approval facilitated or reinforced the likelihood of regulatory approval for zuranolone. In truth, Auvelity's approval presented a substantial threat to zuranolone's regulatory trajectory and commercial outlook, in part because the approval diminished the demand for an additional drug targeting the same indications, especially one that exhibited comparatively weaker outcomes in terms of both long-term efficacy and safety.

292.    On November 8, 2022, Sage submitted a quarterly report on Form 10-Q to the SEC for the third quarter of 2022 (the "3Q22 10-Q"), released a press statement filed as part of a current report on Form 8-K with the SEC, disclosing the Company's financial results for the third quarter

of 2022 (the "3Q22 Press Release"), and conducted a corresponding earnings call (the "3Q22 Earnings Call").

293.    In the 3Q22 10-Q, the Company continued to reference Auvelity in broad terms while failing to disclose the significant risk associated with its FDA approval:

> In August 2022, Axsome Therapeutics, Inc. announced that the FDA had approved AXS-05, a combination formulation of an NMDA receptor antagonist, dextromethorphan, with an FDA-approved antidepressant affecting norepinephrine and dopamine, bupropion, for the treatment of MDD in adults.

294.    During the 3Q22 Earnings Call, Defendant Doherty underscored "the effectiveness and durability seen in our clinical trials in patients who are on zuranolone," specifically citing the SHORELINE study and noting that "zuranolone was generally well tolerated with safety profile seen in the SKYLARK and SHORELINE studies consistent with prior clinical studies." Defendant Greene similarly asserted that "[i]n meeting with the FDA, we agreed that the SHORELINE Study could serve as an understanding of long-term safety and retreatment needs."

295.    Also during the 3Q22 Earnings Call, Defendant Greene reiterated that the FDA's decision not to convene an AdComm could indicate the potential for expedited approval, stating that "[i]f the FDA decides not to have an AdComm as a signal of an earlier approval, we're certainly ready for that."

296.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects.

297.    On December 6, 2022, Sage issued a press release (the "December 6, 2022 Press Release") and conducted a conference call (the "December 6, 2022 Analyst Call"), announcing the completion of the rolling submission of the NDA seeking approval of zuranolone.

298.    During the December 6, 2022 Analyst Call, the Individual Defendants did not

correct or address statements made by a Biogen executive asserting that "there have been no signals of suicidal ideation or symptoms of withdrawal" from zuranolone.

299.    Furthermore, Defendant Benecchi asserted that "it's clear from the LANDSCAPE and NEST programs that the frequency of [adverse events] does drop after the dosing period ends," referencing the SHORELINE study to support the proposition that retreated patients exhibited "a reduction in frequency reported following a second or third dosing." Defendant Doherty subsequently stated that "[w]e're actually very confident in the sustained and durable profile of zuranolone," citing "the LANDSCAPE and NEST program[s]" as supporting evidence.

300.    Defendant Benecchi later reaffirmed that submitting a single NDA for MDD and PPD "makes it a little more efficient for" FDA review, further stating that "we're very confident in the single filing approach."

301.    On January 9, 2023, Sage released a presentation prepared for use at the 41st Annual J.P. Morgan Healthcare Conference scheduled for the following day. The presentation featured a slide stating that zuranolone demonstrated "[s]ustained effects [which] lasted beyond [the] completion of treatment[.]"

302.    On February 6, 2023, the Company released a press statement, filed as part of a current report on Form 8-K with the SEC, announcing that the FDA had granted "priority review" of zuranolone for MDD and PPD. The release explained that "Priority Review is granted by the FDA to applications for medicines that, if approved, would provide significant improvements in the effectiveness or safety of the treatment, diagnosis, or prevention of serious conditions." The press statement further noted:

> The zuranolone NDA includes data from the LANDSCAPE and NEST clinical development programs as well as a Phase 2 study of zuranolone completed by Shionogi in Japan in adults with MDD. The LANDSCAPE program includes five studies of zuranolone in adults with MDD (MDD-201B, MOUNTAIN,

SHORELINE, WATERFALL, and CORAL). The NEST program includes two studies of zuranolone in adult women with PPD (ROBIN and SKYLARK).

303.    On February 16, 2023, the Company submitted its 2022 annual report on Form 10-K to the SEC (the "2022 10-K"), which was executed by Defendants Greene, Iguchi, Jonas, Cola, Paul, Starr, Frates, Germano, Barrett, and Golumbeski. The Company also published a press release, filed as part of a current report on Form 8-K with the SEC, disclosing its financial results for the fourth quarter and full year 2022 (the "FY22 Press Release"), and conducted a corresponding earnings call (the "FY22 Earnings Call").

304.    The FY22 Press Release cited Defendant Greene as stating that, with respect to the Company's "NDA filing for zuranolone in MDD and PPD" and its "promising and targeted pipeline, . . . this momentum puts us in a position of strength as we kick off 2023."

305.    he FY22 Press Release additionally asserted that "[z]uranolone, if approved, could represent the first oral, short course (14-day) medication with rapid onset for MDD and PPD."

306.    The 2022 10-K included the following disclosure concerning Auvelity:

If approved, zuranolone may also face competition for the treatment of MDD from AXS-05, a combination formulation of an NMDA receptor antagonist, dextromethorphan, with bupropion, an FDA-approved antidepressant affecting norepinephrine and dopamine, which such combination formulation was approved in August 2022 by the FDA for the treatment of MDD in adults.

307.    During the FY22 Earnings Call, Defendant Doherty promoted zuranolone's "rapid and sustained reduction in depressive symptoms as early as 2 or 3 days" and its "generally well-tolerated safety profile." Defendant Benecchi likewise remarked that "the opportunity in MDD is large with millions of patients not satisfied with current treatment options," referencing zuranolone's purported rapid onset and durability.

This is why rapidity matters, both in terms of initiating a therapy as soon as patients show symptoms, as well as achieving the rapid improvement of depressive symptoms. The key takeaway here is a more rapid and sustained approach to

treating a depressive episode may increase the likelihood of better symptomatic and functional outcomes. Given the rapid improvements seen in clinical trials to date, we believe that, if approved, zuranolone has the potential to provide a new treatment option to patients suffering with MDD, with the goal of helping them return to a state of well-being sooner.

308.    Defendant Benecchi further asserted that, "[g]iven the unmet need, we believe that zuranolone, if approved, is best positioned at launch for MDD patients requiring a first add or first switch therapy after continuing to experience depressive symptoms, following their initial treatment course, including patients who have tolerability issues or noncompliance with chronic therapy." He went on to state that "there's a high understanding of unmet need in and amongst the payers, and truly a perception that they need something that works quite differently than what they've seen historically."

309.    During the FY22 Earnings Call, Defendant Greene once again remarked that "[i]f the FDA decides not to hold an AdComm and that's a signal of a faster approval, we like that too."

310.    On March 6, 2023, Defendant Greene participated in the Cowen Health Care Conference and reiterated that "if [the FDA doesn't] do an AdComm as a signal of a rapid approval or even early approval, we'll take that too, and we'll be prepared to launch." At the conference, Defendant Greene further stated:

[T]there's a senior team that's been consistent from the beginning with us, that's been engaged.

And even before I started as CEO, I read every regulatory communication. What I can say is all of the regulatory communications and minutes have been consistent from day 1. The FDA was really helpful with Sage designing the landscape in these programs and talking about the Phase IIIs.

They were very helpful in helping to understand one of the Phase IIIs that was designed in REDWOOD that didn't need to get run based upon the SHORELINE data. So the communication with senior levels, medical reviewers and others has been consistent from the beginning.

311.    On March 8, 2023, the Company disclosed that the FDA had decided not to convene

an AdComm in connection with zuranolone's NDA.

312.    As a result of the Individual Defendants' prior representations, this announcement conveyed to the market that FDA approval could be forthcoming sooner than anticipated.

313.    On March 29, 2023, Defendants Iguchi, Benecchi, and Doherty participated in the 2023 Stifel CNS Days Conference on behalf of Sage. During the event, the host expressed "surprise[] that there's not an AdComm," remarking that "that's certainly a good thing. No AdComm, no priority review is usually great," before asking Defendant Doherty whether he was surprised. In response, Defendant Doherty stated that "they've decided in this case that they don't need to convene an expert group of panelists from the outside."

314.    During the conference, Defendant Benecchi emphasized the market potential for zuranolone, noting that it included "about 6.5 million people with MDD who are actively making treatment changes in a given year," and adding that "the vast majority of those have failed one or more existing antidepressants." He further addressed the "nearly 500,000 or so moms or one in eight live births, women that are suffering with PPD who very much acutely need something immediately that can help them get back on a course to well-being." Defendant Benecchi explained that Sage's "ambition with zuranolone in MDD is to be the first data or first switch medication for those that are suffering with MDD" and the "first-line therapy" for women with PPD.

315.    In response to an inquiry concerning Auvelity, Defendant Benecchi omitted any reference to zuranolone's competitor and asserted that "zuranolone has shown itself to be a versatile therapy, either as monotherapy, as an adjunctive therapy, or as a therapy that can be co-initiated with other antidepressants."

316.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and

94

future prospects. In particular, the Individual Defendants: (i) persisted in minimizing the risk presented by Auvelity; (ii) continued to exaggerate the efficacy and durability of zuranolone, including through Defendant Benecchi's statements promoting the drug's purportedly "more rapid and sustained approach to treating a depressive episode"; and (iii) misleadingly suggested that the FDA's decision not to convene an AdComm could be indicative of an expedited approval timeline.

317.    On April 27, 2023, Sage submitted a proxy statement on Form DEF 14A to the SEC (the "2023 Proxy Statement"), seeking shareholder authorization for, inter alia, (i) the re-election of Defendants Cola, Greene, Jonas, and Federer to serve an additional three-year term on the Company's Board, and (ii) the approval of compensation for certain of the Company's executive officers, including Defendants Greene, Iguchi, Benecchi, Gault, and Robichaud.

318.    The 2023 Proxy Statement disclosed the following:

In 2022, we achieved multiple development milestones evaluating SAGE-718, including:

- commencement of the placebo-controlled Phase 2 DIMENSION Study and Phase 2 SURVEYOR Study, and the open-label Phase 3 PURVIEW Study of SAGE-718 in patients with Huntington's disease cognitive impairment;

- announcement of additional results from the open-label Phase 2 PARADIGM Study and commencement of the placebo-controlled PRECEDENT Study in patients with mild cognitive impairment due to Parkinson's disease; and

- commencement of the placebo-controlled Phase 2a LUMINARY Study in patients with mild cognitive impairment and mild dementia due to Alzheimer's disease.

319.    With respect to the Company's internal controls and adherence to legal and regulatory obligations, the 2023 Proxy Statement stated that "the Audit Committee operates under a written charter approved by the Board of Directors, which provides that its responsibilities include the oversight of the quality of our financial reports and other financial information and our

compliance with legal and regulatory requirements" and "reviewing with management and our

independent registered public accounting firm the adequacy of our internal controls over financial

reporting."

320.    With regard to the Company's risk assessment and risk oversight functions, the

2023 Proxy Statement stated:

> Our Board of Directors oversees the management of risks inherent in the operation
> of our business and the implementation of our business strategies. Our Board of
> Directors performs this oversight role by using several different levels of review.
> In connection with its reviews of our operations and corporate functions, our Board
> of Directors addresses the primary risks associated with those operations and
> corporate functions. In addition, our Board of Directors reviews the risks associated
> with our business strategies periodically throughout the year as part of its
> consideration of undertaking any such business strategies. The Board of Directors
> also evaluates from time to time the processes by which our exposure to risk is
> assessed and managed by management.
>
> Each of the committees of our Board of Directors also oversees the management of
> our risk that falls within the committee's areas of responsibility. In performing this
> function, each committee has full access to management, as well as the ability to
> engage advisors.

321.    On May 2, 2023, Sage submitted a quarterly report on Form 10-Q to the SEC for

the first quarter of 2023 (the "1Q23 10-Q"), released a press statement filed as part of a current

report on Form 8-K with the SEC, disclosing the Company's financial results for the first quarter

of 2023 (the "1Q23 Press Release"), and conducted a corresponding earnings call (the "1Q23

Earnings Call").

322.    The 1Q23 10-Q included the following disclosure regarding Auvelity:

> If approved, zuranolone may also face competition for the treatment of MDD from
> AXS-05, a combination formulation of an NMDA receptor antagonist,
> dextromethorphan, with bupropion, an FDA-approved antidepressant affecting
> norepinephrine and dopamine, which such combination formulation was approved
> in August 2022 by the FDA for the treatment of MDD in adults.

323.    During the 1Q23 Earnings Call, Defendant Greene stated that "during

[zuranolone's] review period, we'll not be making detailed comments on the potential label, FDA interactions or other related topics for zuranolone." Nevertheless, Defendant Doherty asserted that "physicians continue to highlight that the potential to achieve both a rapid and sustained effect matters deeply to them and remains critical to their patients," and claimed that zuranolone fulfilled that need. Defendant Doherty further noted that Sage has "received consistent feedback on what they consider the main strengths of the zuranolone clinical data," including "rapid onset of action seen in clinical trials" and "an improvement in depressive symptoms observed as early as day 3. . . . Physicians note that this clinical profile has the potential to be particularly impactful if zuranolone is approved, given zuranolone's 14-day oral course of treatment."

324.    Later during the 1Q23 Earnings Call, Defendant Gault remarked that, "as a clinician that's treated patients with depression, the thing that really strikes me about the zuranolone data is the rapidity of the response and the durability of that response. It's my lead proposition that zuranolone will be used as an add-on ahead of any atypical antipsychotics."

325.    In response to an inquiry regarding recent competitor product launches, Defendant Greene stated that "we are paying close attention to all the new launches, whether it's migraine launches or depression launches. And we are grabbing a whole bunch of learnings from those." Defendant Benecchi affirmed this perspective, specifically referencing Auvelity:

> [A]s you take a step back and you think about the launches, we pay, as Barry said, very close attention to all facets from the way that they target their customers, the size of the sales force, the tools and resources that they're using to effectively manage their launch all the way through to external media and how they're spending their media dollars. So, we have quite a close lens trained on the various competitors and how they're acting in the market.
>
> What I would take a step back and say is that the approval and initial use of other products is really an encouraging signal that both patients and clinicians are really looking for therapies that work. In the case of Axsome's product, it's a therapy that they are looking at because it has a new mechanism of action and works a little bit faster than maybe some of the other medications that have historically been

available in the market for the last 30 years to 35 years. I think this really demonstrates that there's unmet need for new treatment options for the management of MDD. As you know, there still is no treatment, an orally available treatment for PPD, and there is significant need there for a product like zuranolone.

326.    Also during the 1Q23 Earnings Call, Defendant Greene stated that, if zuranolone received approval, the Company intended to "stay below [the] specialty tier" at "roughly around $10,000 per patient per year" for a 14-day treatment.

327.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants: (i) continued to falsely suggest that zuranolone was well-positioned to obtain FDA approval, despite a lack of sufficient data to substantiate its durable efficacy; and (ii) exaggerated the effectiveness of zuranolone and mischaracterized the results of the Company's studies, including by emphasizing the purported "rapidity of the response and the durability of that response" associated with the treatment.

328.    On May 10, 2023, Defendants Robichaud, Benecchi, and Iguchi participated in the BofA Securities 2023 Health Care Conference on behalf of Sage. During the event, Defendant Robichaud addressed a question concerning the FDA's decision not to convene an AdComm, stating that "[a]s we had indicated in the past, we were agnostic to it . . . we look at it as sort of an affirmation that the data set that we've compiled and submitted to the agency has given them a sufficient data in order for them to review the drug and make a determination of whether not the drug should be approved or not."

329.    On May 17, 2023, during the RBC Capital Markets Global Healthcare Conference, Defendant Robichaud addressed the FDA review process and stated that "everything is going according to plan . . . things are going well with them . . . we don't see any problems right now." He further remarked that, "over the years of developing zuranolone from our early days, we've

been working with the agency to create the LANDSCAPE and NEST programs around MDD and PPD, respectively, to allow us to gain the dataset that we always thought would be necessary for the industry review to be able to decide on whether or not to approve this drug . . . we're working very closely with [the FDA]."

330.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants continued to obscure the issues surrounding zuranolone's ability to obtain FDA approval for the treatment of MDD.

331.    On June 12, 2023, at Goldman Sachs's 44th Annual Global Healthcare Conference, Defendant Greene promoted zuranolone's rapid onset and efficacy, stating that "[a]fter 2 oral doses at night, those that respond report starting to feel better" and "then at day 14, those who respond continue to stay well." Defendant Greene noted that the "unmet need is clear" and that "[t]he unique product profile of zuranolone if approved in MDD and PPD is unique for them." He also reiterated that Sage intended to price zuranolone "roughly under $10,000 per patient per year."

332.    On July 25, 2023, Biogen issued a press release announcing its financial results for the second quarter of 2023 and conducted a corresponding earnings call. Analysts noted a departure from prior reporting periods, as Biogen did not reference zuranolone in either its press release or the related earnings call.

333.    As a consequence of the ensuing uncertainty surrounding zuranolone, Sage's stock price declined by 21% over the span of several days, falling from a closing price of $43.95 per share on July 24, 2023, to $34.68 per share on July 31, 2023.

## THE TRUTH EMERGES

334.    On August 4, 2023, Sage issued a press release announcing that the FDA had

approved zuranolone for the treatment of PPD only. The Company revealed that the FDA had issued a Complete Response Letter ("CRL"), denying approval of zuranolone for the treatment of MDD and indicating that additional studies would be necessary to establish its efficacy. Specifically, the Company stated that "[t]he CRL stated that the application did not provide substantial evidence of effectiveness to support the approval of zuranolone for the treatment of MDD and that an additional study or studies will be needed."

335.    On August 7, 2023, Sage submitted a quarterly report on Form 10-Q to the SEC for the second quarter of 2023 (the "2Q23 10-Q"), released a press statement filed as part of a current report on Form 8-K with the SEC, disclosing the Company's financial results for the second quarter of 2023 (the "2Q23 Press Release"), and conducted a corresponding earnings call (the "2Q23 Earnings Call").

336.    In the 2Q23 Press Release and during the 2Q23 Earnings Call, the Individual Defendants offered additional context regarding the FDA's denial of approval for zuranolone in the treatment of MDD, acknowledging that the Company's NDA for MDD likely failed to include adequate evidence to substantiate the drug's durability.

337.    Following this announcement, Sage's stock price plummeted by approximately 53.6% over a three-day period, dropping from a closing price of $36.10 per share on August 4, 2023, to $16.75 per share on August 7, 2023.

338.    On August 31, 2023, Sage announced that it would undertake a "strategic reorganization," which entailed a 40% reduction in its workforce and a restructuring of the Company's leadership team, including the departures of Defendants Robichaud and Doherty.

339.    That same day, RBC released a report offering additional insight into the FDA's review of zuranolone, which revealed, *inter alia*, that: (i) the administration of zuranolone for the

treatment of MDD was linked to adverse effects, including extreme sedation, reportedly resulting in loss of consciousness in multiple patients, and an elevated incidence of suicidality; (ii) "the FDA's characterization of the [adverse effect] profile does not appear completely aligned with SAGE's historical interpretations," indicating that the Individual Defendants had misrepresented information concerning the drug's safety profile; and (iii) the "FDA seemed to suggest an AdComm was never considered because the drug was not first-in-class and there were no scientific/technical issues that would benefit from an AdComm discussion."

340.    With regard to the incidences of suicidal ideation, the FDA's review materials clarified that the SHORELINE study, identified as 217-MDD-303, demonstrated the following:

> In Study MDD-303A, on-treatment, five subjects reported SI, two subjects reported suicide attempts (one of these subjects was also among the five who reported an SI AE), and one subject reported suicidal behavior; off-treatment, four subjects reported SI, two subjects reported suicide attempt, two reported intentional self-injury, and one reported suicidal behavior. In Study MDD-303B, one subject reported on-treatment suicide attempt and one subject reported off-treatment SI.

341.    Despite the disclosures concerning the denial of approval for zuranolone, the Individual Defendants continued to cause the Company to disseminate false and misleading statements.

342.    On September 13, 2023, at the Morgan Stanley 21st Annual Global Healthcare Conference, Defendant Greene stated that "when orally taken SAGE-718 dramatically increases cognition in a very rapid period of time," and that SAGE-324 produced a "change in tremor amplitude," with observed benefits lasting through 28 days at the maximum daily dose of 60 mg.

343.    Defendant Greene further indicated that the pricing for zuranolone in the treatment of PPD would exceed previously discussed levels, stating that "previously, we highlighted that with MDD and PPD, that $10,000 was the ceiling specialty tier," but "I would not consider that on the table right now."

344.    On September 20, 2023, at the T.D. Cowen 3rd Annual Novel Mechanisms in Neuropsychiatry Summit, Defendant Gault noted that, with respect to SAGE-718, the Company was overseeing three studies, adding that "the primary endpoint" for the DIMENSION Study "is the Huntington's Disease Cognitive Assessment Battery, which is a battery of a number of different cognitive tests that test learning and memory" to measure change in function, but clarified that it "hasn't been validated from a regulatory perspective."

345.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. In particular, the Individual Defendants' assertions that "SAGE-718 dramatically increases cognition in a very rapid period of time," and that SAGE-324 effectuated a "change in tremor amplitude" with benefits observed through 28 days, failed to reveal critical limitations in the Company's study methodologies. In fact, Defendant Gault conceded that Sage had selected a primary endpoint for a study of SAGE-718 that was not "validated from a regulatory perspective."

346.    On October 18, 2023, Sage disclosed that the FDA had granted Orphan Drug Designation to SAGE-718, stating that "[m]ultiple clinical studies are ongoing with SAGE-718 across several disease areas."

347.    On November 7, 2023, Sage submitted a quarterly report on Form 10-Q to the SEC for the third quarter of 2023 (the "3Q23 10-Q"), released a press statement filed as part of a current report on Form 8-K with the SEC, disclosing the Company's financial results for the third quarter of 2023 (the "3Q23 Press Release"), and conducted a corresponding earnings call (the "3Q23 Earnings Call").

348.    In the 3Q23 Press Release, the Company disclosed that the wholesale acquisition cost of zuranolone for PPD was $15,900 for a full 14-day treatment course—substantially higher

than the previously stated $10,000 cost. During the 1Q23 Earnings Call, Defendant Benecchi had represented that the cost of zuranolone for PPD was "within the annual wholesale acquisition range of other commonly prescribed branded medications used to treat brain health disorders."

349.    On January 8, 2024, at the 42nd Annual J.P. Morgan Healthcare Conference, Defendant Greene stated that, with respect to SAGE-718, the Company had five "clinical studies up and running this year with four top line data readouts," and, regarding SAGE-324, "what we saw with KINETIC, as we saw at a 60-milligram dose, we saw significant clinically meaningful and statistically significant change in tremor amplitude."

350.    On February 14, 2024, the Company submitted its 2023 annual report on Form 10-K to the SEC (the "2023 10-K"), which was executed by Defendants Greene, Iguchi, Jonas, Cola, Paul, Frates, Germano, Barrett, Golumbeski, and Federer. The Company also issued a press release, filed as part of a current report on Form 8-K with the SEC, disclosing its financial results for the fourth quarter and full year of 2023 (the "FY23 Press Release"), and conducted a corresponding earnings call (the "FY23 Earnings Call").

351.    The 2023 10-K included the following disclosure regarding Auvelity:

Zuranolone, if approved in the future for the treatment of MDD, may also face competition from AXS-05, a combination formulation of an NMDA receptor antagonist, dextromethorphan, with bupropion approved for the treatment of MDD in adults.

352.    During the FY23 Earnings Call, Defendant Greene remarked that, in relation to the evaluation of SAGE-718, "[w]e really are excited by the progress" and "excited to have readouts for both Huntington's, Parkinson's and Alzheimer's this year." Subsequently, Defendant Gault asserted that "we will take what we learned from [SAGE-718's] SURVEYOR study and make a decision about what the proper endpoints should be for DIMENSION . . . we have no reason to believe that th[e] endpoint will not be appropriate or sufficient."

353.    On March 5, 2024, during the T.D. Cowen 44th Annual Healthcare Conference, Defendant Gault addressed an inquiry concerning whether the FDA would "buy into" the utilization of the TETRAS scale in connection with SAGE-324's studies by stating that it is "a good measure to use for signal detection."

354.    On March 19, 2024, Defendant Greene participated in the Stifel Virtual CNS Days conference on behalf of Sage. During the event, the host challenged the Company's application of the Huntington's Disease Cognitive Assessment Battery (HD-CAB) in its SAGE-718 studies, remarking that "[a]nother company in the space basically got feedback from the FDA that they didn't like this measure only a couple years ago," and inquiring, "why rely on this scale and why not try to look at something else or get better regulatory alignment ahead of time." In reply, Defendant Greene clarified that "[w]e have seen good regulatory flexibility in orphan diseases and particularly something here where there's nothing for people suffering from cognitive issues in Huntington's disease" and further noted, "we think we've got a number of primary, secondary endpoint[s] to demonstrate am effect here," emphasizing that "the regulatory precedence is relevant but our conversations are going well."

355.    The host subsequently reiterated that "[t]he measures you guys [are] using, again, don't really have much precedent." In response, Defendant Greene remarked, "we're measuring a lot of different cognitive measures at various time points . . . because we know there may be some learning effect[s] with these kinds of studies . . . we'll see what works well, what doesn't work," and indicated the Company would "sit down with regulators to map out what the right Phase 3s look like."

356.    With respect to SAGE-324, the host inquired whether, "from a regulatory perspective," the Company was "comfortable" with the endpoints and "the way you're

adjudicating tremor." In response, Defendant Greene affirmed that "yes, there's general alignment . . . with these data in hand, we'll have that discussion."

357.    On April 17, 2024, the Company published a press release announcing topline findings from the Phase 2 PRECEDENT study of SAGE-718, revealing that the study "did not meet its primary endpoint of demonstrating statistically significant difference from baseline in participants treated with once-daily [SAGE-718] versus placebo on the Wechsler Adult Intelligence Scale Fourth Edition-IV (WAIS-IV) Coding Test score at Day 42. . . . Analyses did not suggest any meaningful differences versus placebo in the other exploratory endpoints such as SCOPA-Cog. . . . Based on the data, the Company does not plan any further development of [SAGE-718] in [Parkinson's Disease]."

358.    During an earnings call conducted by the Company on the same day, Defendants Greene and Gault addressed the study's failure to achieve the primary or other endpoints. Nevertheless, Defendant Gault asserted that "we believe these results are not necessarily predictive of the results in our other ongoing studies" and further stated:

> It is important to remember that although cognitive impairment is common across Parkinson's, Huntington's and Alzheimer's diseases, the underlying pathophysiology and symptomatology of these diseases are very distinct. Further, the [SAGE-718] studies differ in terms of indication, patient selection criteria, duration of treatment, sample size and certain endpoints.

359.    Defendant Greene reiterated that position, stating that "the results we've seen here are not necessarily predictive of the results we'll see in Huntington's and Alzheimer's," and further emphasized that "the endpoint in the Huntington trials, particularly is very different than the endpoint we saw here."

360.    The market responded adversely to the developments concerning the improperly designed SAGE-718 study, as the price of Sage stock decreased by 19.58%, falling from a closing

price of $15.63 per share on April 16, 2024, to a closing price of $12.57 per share on April 17, 2024.

361.    On April 24, 2024, Sage submitted a proxy statement on Form DEF 14A with the SEC (the "2024 Proxy Statement"), requesting shareholder authorization for, inter alia, (i) the reappointment of Defendants Barrett and Germano to serve an additional three-year term on the Company's Board, and (ii) the approval of compensation for certain of the Company's executive officers, including Defendants Greene, Iguchi, Benecchi, Gault, and Robichaud.

362.    With respect to the Company's internal controls and its adherence to legal and regulatory obligations, the 2024 Proxy Statement represented that "the Audit Committee operates under a written charter approved by the Board of Directors, which provides that its responsibilities include the oversight of the quality of our financial reports and other financial information and our compliance with legal and regulatory requirements," and further that its duties include "reviewing with management and our independent registered public accounting firm the adequacy of our internal controls over financial reporting."

363.    With respect to the Company's risk assessment and risk management functions, the 2024 Proxy Statement asserted that the Board and its committees are responsible for overseeing the Company's approach to identifying, evaluating, and managing significant risks, including financial, operational, legal, and strategic risks. It further noted that these responsibilities are executed through regular engagement with management and the Audit Committee's review of risk-related policies and internal control procedures.

> Our Board of Directors oversees the management of risks inherent in the operation of our business and the implementation of our business strategies. Our Board of Directors performs this oversight role by using several different levels of review. In connection with its reviews of our operations and corporate functions, our Board of Directors addresses the primary risks associated with those operations and corporate functions. In addition, our Board of Directors reviews the risks associated

with our business strategies periodically throughout the year as part of its consideration of undertaking any such business strategies. The Board of Directors also evaluates from time to time the processes by which our exposure to risk is assessed and managed by management.

Each of the committees of our Board of Directors also oversees the management of our risk that falls within the committee's areas of responsibility. In performing this function, each committee has full access to management, as well as the ability to engage advisors.

364.    On April 25, 2024, the Company released a press statement disclosing its financial results for the first quarter of 2024, which confirmed that the Company did "not plan any further development" of SAGE-718 as a treatment for Parkinson's Disease.

365.    During a related earnings call conducted by Sage on the same day, Defendant Gault reiterated the position that the results from the unsuccessful SAGE-718 study were "not necessarily predictive of the results we may see in ongoing Huntington's disease and Alzheimer's disease studies," and further made the following statement concerning the Company's ongoing studies:

> As we said on our call last week, is it is important to remember that these results are not necessarily predictive of the results we may see in our ongoing Huntington's disease and Alzheimer's disease studies, given the very distinct underlying pathophysiology and symptomatology of these diseases. While we're disappointed by the results of the PRECEDENT study, we continue to believe in the potential of [SAGE-718] in the other indications we are studying and look forward to the various data readouts anticipated later this year.

366.    With respect to SAGE-324, Defendant Gault cited "encouraging data" derived from the KINETIC study.

367.    On June 11, 2024, the Company published a press release announcing the findings of SAGE-718's Phase 2 SURVEYOR study, stating that "[t]he study met its primary endpoint demonstrating a statistically significant difference as measured by the [HDCAB] . . . composite score at baseline between healthy participants and [those] with Huntington's Disease." The press

release quoted Defendant Gault as acknowledging that "[t]he study was not designed or powered to demonstrate a statistically significant difference between [SAGE-718] and placebo" but noted that "[t]here was a small numerical difference observed between [SAGE-718] and placebo on the HD-CAB composite score at Day 28."

368.    On June 12, 2024, during the Goldman Sachs Global Healthcare Conference, Defendant Gault stated that SAGE-324 "reduced tremor amplitude," but acknowledged that the 60 mg dose administered in the morning "wasn't very tolerable."

369.    The host of the conference again challenged the Company's reliance on the TETRAS scale, and Defendant Gault again acknowledged the FDA's reluctance to accept TETRAS as an endpoint, but nonetheless justified its continued use:

> [W]e're aware that there has been some regulatory feedback to other sponsors about using the modified ADL. However, when you're trying to learn about how your product works, you want to measure something that is as proximal to its effect as possible. So actually measuring the tremor amplitude is much more proximal than measuring something around activities of daily living down the road.

370.    The following day, the Company released a press statement disclosing topline results from the Phase 2 KINETIC 2 study of SAGE-324 for the treatment of essential tremor. The press release revealed that the study "did not demonstrate a statistically significant dose-response relationship in change from baseline to Day 91 based on the primary endpoint, The Essential Tremor Rating Assessment Scale (TETRAS) Performance Subscale (PS) Item 4 (upper limb) total score, in participants with ET [essential tremor] . . . there were no statistically significant differences demonstrated for any dose of SAGE-324 versus placebo in the change from baseline to Day 91 on the TETRAS PS Item 4 Total Score or the TETRAS Activities of Daily Living (ADL) Composite Score." The Company further disclosed that, "[g]iven these results, Sage and Biogen will close the ongoing open label safety study of SAGE-324 in ET and do not plan to conduct

further clinical development of SAGE-324 in ET."

371.    Following this announcement, the price of Sage stock fell by 20.64%, decreasing from a closing price of $13.08 per share on July 23, 2024, to a closing price of $10.38 per share on July 24, 2024.

372.    On September 26, 2024, Sage disclosed the termination of its collaboration agreement with Biogen concerning the development of SAGE-324.

373.    On October 17, 2024, the Company announced an additional "strategic reorganization," pursuant to which Sage would eliminate 33% of its total workforce, including 55% of its research and development personnel. The restructuring also encompassed the departure of five senior executives, including Defendant Iguchi.

## DAMAGES TO SAGE

374.    As a direct and proximate result of the Individual Defendants' misconduct, Sage has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

375.    Such expenditures include, but are not limited to, legal fees associated with defending against the federal securities lawsuit as well as any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

376.    These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

377.    These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

378.    As a direct and proximate result of the Individual Defendants' actions, Sage has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

379.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

380.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

381.    Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

382.    Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

383.    Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

384.    At the time this action was initiated, the seven-member Board consisted of Defendants Greene, Barrett, Cola, Federer, Frates, Germano, and Golumbeski (collectively, the

"Director Defendants"). Plaintiff is required to demonstrate only that a majority, *i.e.* four of the Director Defendants, are incapable of exercising independent and disinterested judgment regarding whether to pursue this action or to vigorously advance its prosecution.

385.    The Director Defendants either were aware or, in the exercise of reasonable diligence, should have been aware of the false and misleading statements disseminated on the Company's behalf and failed to undertake any good faith efforts to prevent or rectify the resulting misconduct.

386.    Each of the Directors approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

387.    Each of the Directors authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

388.    Furthermore, the Director Defendants knowingly disregarded, or acted with reckless indifference toward, the evident deficiencies in the Company's internal controls, practices, and procedures, and failed to undertake any good-faith effort to remediate those deficiencies or to prevent their recurrence.

**Defendant Greene**

389.    Defendant Greene is not disinterested or independent, and therefore, is incapable of considering demand because, Greene is, and was at all relevant times, an employee (CEO since

December 2020) who derived substantially all of his wealth and livelihood from his relationship with the Company making him not disinterested or independent.

390.    The lack of independence and financial benefits received by Greene renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

391.    Greene is also a defendant in the Securities Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

392.    For these reasons, Defendant Greene violated his fiduciary duties, faces a substantial likelihood of personal liability, lacks independence and disinterest, and accordingly, demand upon him is futile and thereby excused.

**Defendants Frates, Cola, Barrett, and Federer**

393.    Defendants Frates (Chair), Cola, Barrett, and Federer are not disinterested or independent and, therefore, are incapable of considering demand because they serve as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, inter alia, accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements. Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge, these Defendants caused these improper statements.

394.    For these reasons, Frates (Chair), Cola, Barrett, and Federer breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

395.    The Directors, as members of the Board, were and are subject to the Code of Business Conduct and Ethics, which go well beyond the basic duties required by applicable laws,

rules, and regulations. Specifically, the Codes require Directors to act in good faith, responsibly, with due care, avoid conflicts of interest, ensure accurate and timely disclosures, and promptly report any violations. The Director Defendants violated these Codes because they knowingly or recklessly permitted the Company to issue materially false and misleading statements alleged herein. Consequently, the Director Defendants breached the Company's Code of Business Conduct and Code of Ethics, face substantial liability, and are not independent or disinterested, making demand upon them futile.

396.    Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately assessing and managing risks, overseeing the Company's internal control over financial reporting, overseeing disclosure controls and procedures and calling into question the Individual Defendants' conduct. Thus, any demand upon the Directors would be futile.

397.    All current members of the Board receive substantial revenue from the Company, exert control over its operations, and maintain interdependent relationships with one another. These conflicts of interest have impaired the Board's ability to objectively evaluate or challenge the conduct of the Director Defendants.

398.    None of the current members of the Board have undertaken any corrective measures to address the misconduct alleged herein. For example, none of the current directors have attempted to enforce the Company's Clawback Policy, which states:

> In the event we are required to prepare an accounting restatement due to material
> noncompliance with any financial reporting requirement under U.S. federal

securities laws, including any required restatement to correct an error in previously issued financial statements that is material to the previously issued financial statements or that would result in a material misstatement if the error were corrected in the current period or left uncorrected in the current period, it is our policy to recover reasonably promptly the amount of erroneously awarded incentive-based compensation received by Covered Persons. The recovery of such compensation applies regardless of whether an executive engaged in misconduct or otherwise caused or contributed to the requirement for the accounting restatement.

399.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

400.    Sage has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Sage any part of the damages Sage suffered and will continue to suffer, thereby. Thus, any demand to the Directors would be futile.

401.    The acts complained of herein constitute violations of fiduciary duties owed by Sage's officers and directors, and these acts are incapable of ratification.

402.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Sage. If there is a directors' and officers' liability

insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Sage, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

403.    If there is no directors' and officers' liability insurance, then the Directors will not cause Sage to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

404.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least four of them, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## COUNT I

**Breach of Fiduciary Duty**
**Against the Individual Defendants**

405.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

406.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sage's business and affairs.

407.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of

the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Sage's shareholders.

408.    In breach of their fiduciary duties owed to Sage, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

409.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sage's securities.

410.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

411.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sage has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

412.    Plaintiff, on behalf of Sage, has no adequate remedy at law.

## COUNT II

**Violations of Section 14(a) of the Exchange Act and Rule 14a-9
Against the Director Defendants**

413.    Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

414.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that,

[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

415.    Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

416.    Under the direction and watch of the Director Defendants, the Company made materially misleading statements in its Annual Proxies filed with the SEC in 2021, 2022, 2023, and 2024 (the "Proxies").  As set forth above, these filings included materially false and misleading representations regarding the Company's principal drug candidates, its adherence to legal and regulatory requirements, and the sufficiency of the Company's internal control framework and risk oversight mechanisms, which as a result, misleadingly induced shareholders to vote in favor of the election of Defendants Barrett, Germano, Paul, Frates, Golumbeski, Starr, Cola, Greene, Jonas, and Federer and performance-based compensation to Defendants Greene, Jonas, Iguchi, Robichaud, Benecchi, and Gault, to which they were not entitled.

417.    The Director Defendants knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the Proxies were materially false and misleading.

418.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxies.

117

419.    Plaintiff has no adequate remedy at law.

## COUNT III

### Unjust Enrichment Against
### The Individual Defendants

420.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

421.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Sage.

422.    Each of the Defendants received payment from Sage, in the form of either salary or director fees while actively breaching their fiduciary duties to Sage.

423.    All the payments and benefits provided to defendants were at the expense of Sage. The Company received no benefit from these payments.

424.    Plaintiff, as a shareholder and a representative of Sage, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

425.    Plaintiff, on behalf of Sage, has no adequate remedy at law.

## COUNT IV

### Waste of Corporate Assets
### Against the Individual Defendants

426.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

427.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Sage to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

428.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

429.   Plaintiff, on behalf of Sage, has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)   Declaring that the Plaintiff may maintain this action on behalf of Sage and that Plaintiff is an adequate representative of the Company;

b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Sage;

c)   Determining and awarding to Sage the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)   Directing the Individual Defendants to take all necessary actions to reform and improve Sage's corporate governance and internal procedures to comply with applicable laws and to protect Sage and its shareholders from a repeat of the damaging events described herein;

e)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May 22, 2025

**KUEHN LAW, PLLC**

*/s/Justin Kuehn*
Justin A. Kuehn
53 Hill Street, Suite 605
Southampton, NY 11968
Phone: (833) 672-0814
justin@kuehn.law

*Attorneys for Plaintiff*

120

## <u>VERIFICATION</u>

     I, Joseph Pizzelanti, have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Sage Therapeutics, Inc. common stock at all relevant times.

     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _21_ day of _May_ 2025.

Joseph Pizzelanti (May 21, 2025 18:21 EDT)

Joseph Pizzelanti